WinSTAR COMMUNICATIONS, INC., Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 98–480C.**

United States Court of Federal Claims.

Sept. 9, 1998.

Christopher R. Yukins, Washington, D.C., for plaintiff. Frank K. Peterson, of counsel.

Ronald G. Morgan, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. John E. Cornell, Senior Assistant General Counsel, U.S. General Services Administration, of counsel.

## OPINION [1]

MEROW, Judge.

This procurement protest arises out of WinStar Communications, Inc.'s ("WinStar") objections to a solicitation issued by the United States General Services Administration ("GSA"). GSA is procuring local telecommunications services for federal agencies under a nationwide program known as the Metropolitan Area Acquisition. The program will begin in three cities, New York,

San Francisco, and Chicago. The Request for Proposals ("RFP") for New York (no. TQD–NY–98–1001) was issued on February 26, 1998. The New York RFP states that one indefinite delivery/indefinite quantity contract for local telecommunications services will be awarded for an area consisting of the five boroughs of New York City and suburban locations in New York and New Jersey.

WinStar objects to the solicitation on two grounds. First, WinStar alleges that GSA's decision to award a single contract is arbitrary and contrary to the agency's legal duty to give preference to awarding multiple indefinite delivery/indefinite quantity contracts under a single solicitation to the maximum extent practicable. Second, WinStar asserts that the geographic scope of the proposed New York contract gives the incumbent, Bell Atlantic Co., an unfair competitive advantage, contrary to GSA's legal obligation to obtain full and open competition. WinStar seeks declaratory and injunctive relief and proposal preparation costs.

The matter is currently before the court on cross-motions for summary judgment. For the reasons stated below, it is concluded that GSA's decision to award a single contract under the New York RFP is arbitrary, capricious, and not in accordance with the legal preference for multiple awards. It is also concluded, however, that the geographic scope of the proposed New York contract is not anti-competitive or otherwise improper. Finally, it is concluded that relief should be limited to a declaratory judgment setting aside GSA's decision to award a single contract under the New York RFP and all related RFP provisions. Therefore, plaintiff's motion is granted to the extent it seeks such relief and is otherwise denied. Defendant's motion is denied in its entirety.

## I. BACKGROUND

### 1. The Statutory and Regulatory Preference for Multiple Awards

The Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, 108 Stat. 3243

1. This Opinion was originally filed under seal on September 4, 1998, subject to review by the parties for material subject to a Protective Order. On September 9, 1998, the parties informed the Court that the Opinion did not disclose any protected information. Accordingly, the Opinion is released for publication on this date, September 9, 1998.

("FASA"), established "a preference for awarding, to the maximum extent practicable, multiple task or delivery order contracts for the same or similar services or property." 41 U.S.C. § 253h(d)(3) (1994). FASA also required that regulations implementing the preference "establish criteria for determining when award of multiple task or delivery order contracts would not be in the best interest of the Federal Government." *Id.*

A task order contract is a "contract for *services* that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 41 U.S.C. § 253k(1) (emphasis added). A delivery order contract is "a contract for *property* that does not procure or specify a firm quantity of property (other than a minimum or maximum quantity) and that provides for the issuance of orders for the delivery of property during the period of the contract." *Id.* (emphasis added). An indefinite quantity task or delivery order contract, such as the proposed New York contract at issue in this case, "provides for an indefinite quantity, within stated limits, of supplies or services to be furnished during a fixed period, with deliveries or performance to be scheduled by placing orders with the contractor." 48 C.F.R. § 16.504(a) (1997).

In its report on the bill which became FASA, the Senate Committee on Governmental Affairs explained that the preference for awarding multiple task or delivery order contracts was based on the finding that

> indiscriminate use of task order contracts for broad categories of ill-defined services unnecessarily diminishes competition and results in the waste of taxpayer dollars. In many cases, this problem can effectively be addressed, without significantly burdening the procurement system, by awarding multiple task order contracts for the same

or similar services and providing reasonable consideration to all such contractors in the award of such task orders under such contracts. The Committee intends that all federal agencies should move to the use of multiple task order contracts, in lieu of single task order contracts, wherever it is practical to do so.

S.Rep. No. 103–258, at 15–16 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2576.

The Committee's findings are consistent with the conclusions of the Office of Federal Procurement Policy ("OFPP").[2] In its July 1997 interim report, *Best Practices for Multiple Award Task and Delivery Order Contracting,* OFPP states:

> A single award ID/IQ contract often makes it difficult for the government to secure the same price reductions and contractor performance improvements that would occur if the contractor was competing against other qualified contractors throughout the contract.

*    *    *    *    *    *

> The use of multiple award contracts allows agencies to take continuous advantage of the competitive forces of the commercial marketplace which will result in lower prices, better quality, reduced time from requirements identification to award, and improved contractor performance in satisfying customer requirements.[3]

Of specific relevance here, OFPP also found that the use of multiple award contracts to buy information technology ("IT"), which includes telecommunications services, may be especially beneficial:

> Use of multiple award contracts may be especially effective for maintaining better prices and quality in the IT market. Before FASA, many agencies relied on long-term ID/IQ and umbrella contracts with technology refreshment and price reduction clauses to take advantage of falling

---

**2.** OFPP is responsible for "provid[ing] overall direction of Government-wide procurement policies, regulations, procedures, and forms for executive agencies and to promote economy, efficiency, and effectiveness in the procurement of property and services by the executive branch of the Federal Government." 41 U.S.C. § 404(a) (Supp. II 1996).

**3.** A copy of OFPP's report was not submitted as part of the administrative record. Instead, the on-line version was cited by the parties which is located at: <http://www.arnet.gov/BestP/BestP-MAT.html>. Chapter 2 of the report contains all of the text quoted in this opinion.

prices and new technology. Even with these clauses, the government had to negotiate in a sole-source environment and was often unable to realize the economies and efficiencies afforded by vigorous competition among vendors in the marketplace.

By offering market competition on price and technology for each order, multiple award contracting provides [contracting officers] with the flexibility needed to better match the dynamics of the IT market. Pre–FASA experimentation with various forms of continuing competition among multiple awardees on IT contracts demonstrates the potential of this approach....

*Id.* The report cites several examples of multiple award contracts in the IT industry and other industries which produced substantial benefits to the government as a result of the head-to-head competition for task awards issued over the life of the contract. *Id.*

Similarly, with respect to FTS 2000, the GSA-managed program currently providing long-distance telecommunications services to federal agencies, GSA found that direct competition between the two contractors, AT & T and Sprint, has saved the government an estimated $1 billion and produced prices significantly lower in the aggregate than the lowest commercially available tariffs for comparable services. AR Tabs 12–13. Likewise, according to a 1993 GSA study, "[t]he general agency consensus, and the experience of FTS 2000, is that competition among multiple vendors is the best way of obtaining low prices."[4]

Pursuant to FASA, the Federal Acquisition Regulation ("FAR") was amended to establish a preference scheme for making multiple awards of indefinite-quantity contracts under a single solicitation. Specifically, FAR 16.504(c)(1) provides:

[T]he contracting officer shall, to the maximum extent practicable, give preference to making multiple awards of indefinite-quantity contracts under a single solicitation for the same or similar supplies or services to two or more sources. In making a determination as to whether multiple awards

are appropriate, the contracting officer shall exercise sound business judgment as part of acquisition planning. No separate written determination to make a single award is necessary when the determination is contained in a written acquisition plan or when a class determination has been made in accordance with subpart 1.7.

48 C.F.R. § 16.504(c)(1). Also as required by FASA, the FAR lists six criteria for determining when multiple awards should not be made:

Multiple awards should not be made if the contracting officer determines that—

(i) Only one contractor is capable of providing performance at the level of quality required because the supplies or services are unique or highly specialized;

(ii) Based on the contracting officer's knowledge of the market, more favorable terms and conditions, including pricing, will be provided if a single award is made;

(iii) The cost of administration of multiple contracts may outweigh any potential benefits from making multiple awards;

(iv) The tasks likely to be ordered are so integrally related that only a single contractor can reasonably perform the work;

(v) The total estimated value of the contract is less than the simplified acquisition threshold; or

(vi) Multiple awards would not be in the best interests of the Government.

*Id.*

## 2. The Metropolitan Area Acquisition Program

GSA is charged with responsibility for acquiring telecommunications services for federal agencies as a follow-on to FTS 2000. *See* 40 U.S.C. § 1424 (Supp. II 1996). The procurement of local telecommunications services is covered under the Metropolitan Area Acquisition ("MAA") program. Long distance services are covered by a separate program known as FTS 2001.

---

**4.** The study, cited in the record at AR Tab 1 at 8, can be found on-line at: <http://

post.fts2k.gsa.gov/gsa_docs/FCSWG_9311/sec6.html>.

The MAA program is divided into two phases, the initial qualification phase and the RFP phase. During the initial qualification phase, interested vendors are qualified for participation in the MAA program generally. In response to a Request for Qualification Statements ("RQS"), an interested vendor must submit a qualification statement demonstrating its ability to meet the basic technical and management requirements of the MAA program. GSA then either qualifies the vendor or identifies deficiencies in its statement which must be remedied during the second phase of the program.

The second phase involves the issuance of RFPs and the award of contracts for specific metropolitan areas. As stated above, three pilot cities have been selected, New York, Chicago, and San Francisco. If the results in these cities are favorable, GSA plans to expand the MAA program to as many as 43 metropolitan areas.

When submitting proposals, vendors whose qualification statements were approved during the initial qualification phase need only demonstrate their ability to meet the unique technical, management, and price requirements of the applicable metropolitan area. If a vendor's qualification statement was deemed deficient, the vendor must rectify the deficiencies in its proposal in addition to satisfying the unique metropolitan area requirements. Vendors who did not participate in the initial qualification phase may also submit proposals, but they must demonstrate their ability to meet all of the basic program requirements as well as the area-specific requirements.

Federal agencies are not required to participate in the MAA program. Instead, they are free to purchase local telecommunications services from non-MAA vendors to the extent permitted by law. However, GSA projects that, once the MAA program is established, 80% of the federal agencies within the program will purchase their local telecommunications services from MAA contractors.

On November 26, 1997, GSA, through its Office of the Federal Technology Service, issued the RQS initiating the first phase of the MAA program. The RQS states that GSA will award one indefinite delivery/indefinite quantity ("ID/IQ") task order contract under each metropolitan area RFP. AR Tab 40 § M.4. 1. None of the acquisition planning documents predating the RQS discusses GSA's decision in this regard. There is no indication that a class determination to make a single award was made pursuant to FAR subpart 1.7. Also, the CO did not prepare a written determination to make a single award prior to release of the RQS.

The RQS states that each MAA contract will be for a base period of four years followed by four one-year options. The contractor must provide a variety of local telecommunications services across the entire metropolitan area as ordered by GSA. The services may be provided through the contractor's own facilities, through resale of another vendor's services, or through a combination of the two. The contracts will not provide a minimum quantity of services to be ordered. However, to provide adequate consideration, each contract will contain a revenue guarantee which the contractor will be paid regardless of the quantity of services ordered.

The RQS states that each MAA contract will provide for a one-year "forbearance period." This means, for example, that during the first year of the New York contract, other MAA and FTS 2001 contractors may not provide services to federal agencies in New York in competition with the New York MAA contractor. The purpose of the forbearance period is to allow the MAA contractor to convert the federal users within its area to its network and to recover investment costs. Barber Dec. ¶ 11. After the forbearance period, other MAA and FTS 2001 contractors may serve federal agencies in New York so long as they obtain contract modifications permitting them to do so. These modifications will require GSA's approval. GSA has stated that approval depends on whether GSA concludes it is in the government's best interests to have multiple providers in a single metropolitan area. *Id.*

Finally, the RQS indicates that each MAA contract will contain a Price Maintenance Mechanism. This will allow GSA to adjust the contract prices to match falling prices for

comparable services available in the MAA area on publicly available tariffs. GSA may invoke the Price Maintenance Mechanism no more than once every six months.

On February 26, 1998, WinStar timely submitted a qualification statement in response to the RQS. Although GSA has not responded to WinStar's qualification statement or otherwise concluded the initial qualification phase, the agency has issued RFPs for the three pilot cities, New York, San Francisco, and Chicago.

### 3. The New York RFP

The New York RFP was issued on February 26, 1998. Consistent with the RQS, section M.3.1 of the RFP states that the government intends to award one ID/IQ contract for the New York metropolitan area. AR Tab 41 § M.3.1. Neither the Acquisition Plan for the MAA program approved during February 1998 nor any other document in the record predating the New York RFP explains GSA's decision to award a single contract. Likewise, the CO did not prepare a written determination to make a single award pursuant to FAR 16.504(c)(1) prior to issuance of the solicitation.

The New York RFP defines the contract area as the five boroughs of New York City; Lower Westchester County, Nassau County, and Western Suffolk County, New York; and Hudson County, Southern Bergen County, Eastern Essex County, Eastern Union County, and Eastern Passaic County, New Jersey. GSA's goal in designing the geographic scope of the contract was to include all existing user locations, potential new customers, and potential communities of interest concentrated in and around New York City. Fridman Dec. ¶¶ 3–9; Barber Dep. 91–92.

The RFP states that the revenue guarantee for the New York contract will be $7 million. Proposals were originally due on April 27, 1998. However, by amendment the due date was changed to June 10, 1998.

### 4. WinStar's Protest

On June 4, 1998, WinStar notified the government of its intent to protest the New York RFP on four grounds, including its objection to GSA's decision to award only one ID/IQ contract. On June 5, 1998, before the due date for proposals, WinStar filed its complaint in this court. Although the complaint contains four counts, the issues raised in counts I and II have been resolved to the satisfaction of the parties and therefore will not be discussed. In Count III, WinStar asserts that the government failed to give preference to awarding multiple ID/IQ contracts under the New York RFP as required by 41 U.S.C. § 253h(d)(3) and FAR 16.504(c)(1). In Count IV, WinStar alleges that the geographic scope of the proposed New York contract does not achieve full and open competition as required by the Competition in Contracting Act, 41 U.S.C. § 253(a)(2) (1994) ("CICA"), because it gives an unfair advantage to the incumbent, Bell Atlantic Co., the only company with sufficient facilities to service the entire area directly. The complaint seeks an order directing GSA "to reform the New York MAA RFP to maximize competition, including, but not limited to, the award of multiple contracts for the New York MAA and the award of contracts for less than the entire GSA-defined MAA region." Compl. ¶ 45.

WinStar also applied for a temporary restraining order ("TRO") and moved for a preliminary injunction prohibiting GSA from accepting proposals in response to the New York RFP until the court decided the merits of the protest. However, following negotiations, GSA agreed to extend the due date for proposals until August 6, 1998. GSA also stated that it would not award a contract under the New York RFP until this protest is resolved. As a result, WinStar withdrew its application for a TRO and its motion for a preliminary injunction.

### 5. The CO's Determination to Award a Single ID/IQ Contract Under the New York RFP

On June 5, 1998, the day after receiving notification of WinStar's intent to protest, the CO in charge of the New York MAA, Phillip L. Barber, prepared a "Determination that the Indefinite–Quantity Contract is to be Awarded as a Single Award Contract for the New York [MAA]" pursuant to FAR

16.504(c)(1).[5] His determination was subsequently revised and then restated in a declaration dated June 19, 1998, which is attached to defendant's summary judgment motion.

The CO states that three of the six criteria in FAR 16.504(c)(1) for determining when multiple awards should not be made justified his decision to award a single contract. First, he determined that more favorable terms and conditions, including pricing, would be provided if a single award were made. FAR 16.504(c)(ii). Second, he determined that the costs of administrating multiple contracts would outweigh any potential benefits. FAR 16.504(c)(iii). Finally, he determined that multiple awards would not be in the best interests of the government. FAR 16.504(c)(vi).

These determinations were, in turn, based on four factors. First, based on industry feedback, the CO concluded that a substantial commitment from the government was needed to stimulate the winning vendor to invest in new telecommunications facilities, to reduce investment risks, and to induce vendors to compete for the New York contract. Therefore, the CO found that it was in the government's best interests to commit all 22,000 federal lines in the New York area and the entire $7 million revenue guarantee to one vendor. Barber Dec. ¶¶ 13–16.

Second, the CO found that a single award would reduce usage charges. The government incurs usage charges for "off-net" calls but not for "on-net" calls. According to the CO, on-net calls are government-to-government calls within the contract area serviced by the same vendor. Government-to-government calls within the contract area but serviced by more than one vendor are, according to the CO, off-net and therefore subject to usage charges. Hence, the CO concluded that having the services provided by a single vendor will ensure that all agencies within the MAA are able to communicate on one network without incurring usage charges. The CO estimated that a single award will save the government $71,500 per month in usage charges. Barber Dec. ¶¶ 18–20.

Third, the CO found that a single award would produce "traffic aggregation" which will result in lower prices. This finding is based on the consideration that if a single contractor is able to service all 22,000 lines in the New York area instead of 10,000 or 5,000, it will result in economies of scale which will be passed on to the government in the form of lower prices. Barber Dec. ¶ 17(b); Barber Dep. 36.

Finally, the CO states that a single contract award will reduce the complexity of service coordination and eliminate administrative costs generally associated with multiple awards. Barber Dec. ¶¶ 13, 21.

## 6. The Parties' Contentions

Defendant filed the administrative record on June 12, 1998.[6] On June 26, 1998, defendant moved for summary judgment pursuant to RCFC 56. Plaintiff filed its cross-motion on July 10, 1998. Briefing was completed on July 24, 1998, and oral argument was held on August 11, 1998.

In support of its motion, the government first argues that WinStar has no standing to challenge the CO's single award determination because the purpose of the statutory and regulatory preference for multiple awards is to benefit the government, not WinStar. In addition, defendant contends that WinStar has not alleged an injury resulting from the single award determination which the court can redress. Plaintiff responds that it has standing under the Tucker Act, 28 U.S.C. § 1491(b)(1), because it is an interested party objecting to a solicitation. Plaintiff contends further that its injury resulting from GSA's improper single award decision, the lost opportunity to compete for multiple contracts

---

5. Also on June 5, 1998, four different divisions of GSA approved the "New York MAA Source Selection Plan" which reflects the substance of the CO's single award determination.

6. The CO's June 5, 1998 determination to make a single award under the New York RFP was not included in the administrative record. In fact, the determination was not provided to plaintiff and the court until July 17, 1998, as an attachment to defendant's reply brief. Likewise, the June 5, 1998 Source Selection Plan reflecting the CO's determination was not included in the administrative record and was not produced until July 6, 1998.

and reduced chances of receiving a contract, can be adequately redressed if the relief sought in the complaint is granted.

As to the merits, plaintiff challenges GSA's decision to award a single contract under the New York RFP on procedural and substantive grounds. First, plaintiff contends that FAR 16.504(c)(1) required the CO to determine whether multiple awards were appropriate *before* GSA decided to make a single award. Since the CO's analysis was created only after WinStar's protest was filed and months after the single award decision was made, plaintiff contends that it is a post-hoc rationalization which contravenes regulatory requirements. Defendant responds that the CO's determination was timely because it was made before contract award, which is all that FAR 16.504(c)(1) requires.

With regard to the substance of the CO's analysis, plaintiff argues that it is flawed because it does not address and weigh the benefits of multiple awards and does not rationally weigh the purported costs of multiple contracts. Defendant responds that the CO's analysis is reasonable because the structure of the New York RFP provides for competition among multiple providers, the end which multiple awards is meant to achieve, without the costs of multiple contracts. Defendant adds that the Price Maintenance Mechanism will also ensure that the government achieves the price benefits of multiple awards without the costs. In addition, defendant maintains that the CO rationally weighed the costs of multiple awards in determining that a single award was in the government's best interests.

Finally, plaintiff asserts that the geographic scope of the proposed New York contract area is overly broad and violates CICA because it hinders the ability of all vendors but Bell Atlantic, the only vendor who can service the entire area directly, to compete. Defendant responds that the proposed contract area was reasonably designed to meet a legitimate government objective and that Bell's purported advantage is the result of incumbency, not any unfair government action.

## II. DISCUSSION

### 1. Standing and Jurisdiction

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870 (1996) ("ADRA"), amended the Tucker Act to provide the court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract ... or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (Supp. II 1996).

■ Under the plain language of the statute, a protester has standing to object to a solicitation or "any alleged violation" of procurement laws so long as it is an "interested party." Contrary to defendant's assertions, there is no additional requirement of showing that the procurement statute or regulation at issue was intended to benefit or confer a private right of action upon the protester. *See Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 345, 353 n. 4 & 356–57 (1997) (rejecting similar assertion in protest based on agency's alleged non-compliance with statutory preference for multiple awards of advisory and assistance contracts, 41 U.S.C. § 253i (1994)).

Since the Tucker Act does not define "interested party," the court has looked for guidance to 31 U.S.C. § 3551(2), which defines the term for procurement protests before the General Accounting Office as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (Supp. II 1996); *see Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 153 (1997) (applying § 3551(2)); *Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 663, 669–70 (1997) (same).

■ WinStar was a prospective offeror when it filed this protest and has since submitted a proposal. Furthermore, WinStar's direct economic interests would be affected by GSA's failure to award multiple contracts since WinStar, as an offeror, stands a better chance of receiving a contract if multiple awards are made. WinStar's economic inter-

ests would also be affected by a failure to award contracts for less than the entire proposed MAA area. WinStar is more competitive in some areas, such as New York City, and therefore stands a better chance of receiving a contract if the proposed contract area is divided. In short, as an actual offeror whose competitive position may improve if the challenged solicitation provisions are set aside, WinStar is an interested party with standing to bring this protest. While defendant correctly asserts that WinStar must also prove prejudice, this will be addressed in determining whether WinStar has prevailed on the merits and is entitled to relief. *See Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) ("[T]o *prevail* in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.") (emphasis added); *Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) ("only a 'clear and prejudicial' violation of a procurement statute or regulation *warrants relief*") (emphasis added).

## 2. Standard of Review

WinStar's protest is currently before the court on the parties' cross-motions for summary judgment. Each motion must be evaluated on its own merits and will be granted only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987).

■ Under the standard of review applicable in bid protests, an agency's procurement decisions will not be disturbed unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); 28 U.S.C. § 1491(b)(4). This standard is a deferential one. The court's role is limited to ensuring "that the agency has 'examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Rainbow Navigation, Inc. v. Department of Navy,* 783 F.2d 1072, 1080 (D.C.Cir.1986) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463

U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "The court should not substitute its judgment for that of a procuring agency and should intervene only when it is clear that the agency's determinations were irrational or unreasonable." *Cincom Sys.,* 37 Fed. Cl. at 672. The agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, that presumption does not shield the agency's decision from a "thorough, probing, in-depth review." *Id.*

## 3. Procedural Validity of GSA's Single Award Decision

As stated above, plaintiff contends that GSA's decision to award a single contract under the New York RFP is procedurally invalid because it was made months before the CO prepared the written determination required by FAR 16.504(c)(1). Defendant responds that the CO's determination was timely because it was made before contract award, which is all that FAR 16.504(c)(1) requires.

■ The regulatory language provides:

[T]he [CO] shall, to the maximum extent practicable, give preference to making multiple awards of indefinite-quantity contracts under a single solicitation for the same or similar supplies or services to two or more sources. *In making a determination as to whether multiple awards are appropriate, the [CO] shall exercise sound business judgment as part of acquisition planning.* No separate written determination to make a single award is necessary when the determination is contained in a written acquisition plan or when a class determination has been made in accordance with subpart 1.7.

48 C.F.R. § 16.504(c)(1) (emphasis added). Acquisition planning logically occurs *before* a solicitation is issued. It is the means by which the agency designs the solicitation to "ensure that the Government meets its needs in the most effective, economical, and timely manner." 48 C.F.R. §§ 7.102(b), 7.101. Thus, the FAR plainly contemplates that the CO's determination, whether set forth in the

acquisition plan, in a class determination made under FAR subpart 1.7, or in a separate document, will precede and form the basis of an agency decision to override the preference for multiple awards.

This procedure was not followed in this case. GSA made the decision to award a single ID/IQ contract per RFP sometime before November 26, 1997, when the RQS was released. Likewise, GSA made the specific decision to award a single contract under the New York RFP sometime before the release of the solicitation on February 26, 1998. The CO has stated that these were "program decisions" which he did not make. Barber Dep. 99. None of the documents in the record predating the RQS or the RFP explain the basis of GSA's decision. The agency did not make a class determination in accordance with FAR subpart 1.7 or address the single award decision in the Acquisition Plan. Nor did the CO make a separate written determination to make a single award prior to release of the RQS or the New York RFP.

Instead, the CO made the required determination on June 5, 1998, over three months after issuance of the New York RFP, six months after issuance of the RQS, and one day after WinStar notified GSA of its intent to file a protest based in part on its objections to the single award decision. Not only is this course of action inconsistent with the procedure contemplated by the FAR, it gives the impression that the CO's determination was prepared to defend against WinStar's protest rather than to impartially determine in the first instance whether multiple awards are appropriate.

■ However, as stated above, not every impropriety in the procurement process warrants relief. A protester must show it has been prejudiced by the impropriety. *Data Gen.*, 78 F.3d at 1562. In this case, the government's procedural violation of FAR 16.504(c)(1) has not caused WinStar any injury which judicial relief can rectify. If the matter were remanded to the agency solely on the basis of its procedural error, GSA would be free to adopt the substance of the CO's analysis and again conclude that a single award is appropriate. In fact, this is

virtually certain to occur since GSA has strenuously argued throughout these proceedings that the CO's reasoning is sound. Therefore, GSA's procedural violation of FAR 16.504(c)(1) is not prejudicial, and any judicial intervention on the basis of the violation would be futile. *See Cubic*, 37 Fed.Cl. at 357 (declining to set aside contract award based on Army's untimely determination to override preference for multiple awards of advisory and assistance contracts because "there is no reason to think [the Army] would come to a different conclusion if the award were voided and the solicitation reissued.")

### 4. Substantive Validity of the CO's Single Award Determination

■ With respect to the substantive validity of the CO's determination to award a single ID/IQ contract under the New York RFP, plaintiff first asserts that his analysis must be set aside because it fails to address and weigh the benefits of awarding multiple contracts as required by FAR 16.504(c)(1).

The CO concluded that three of the six regulatory criteria for determining when multiple awards should not be made justified his decision to award a single contract:

(ii) Based on the contracting officer's knowledge of the market, more favorable terms and conditions, including pricing, will be provided if a single award is made;

(iii) The cost of administration of multiple contracts may outweigh any potential benefits from making multiple awards; and

(vi) Multiple awards would not be in the best interests of the Government.

48 C.F.R. § 16.504(c)(1).

Each of these criteria plainly requires consideration of the benefits of multiple awards. Obviously, it is impossible to conclude that a single award will provide more favorable terms and conditions, including pricing (16.504(c)(1)(ii)), without first considering the terms and conditions which would result from multiple awards. Likewise, the conclusion that the costs of administering multiple contracts may outweigh the potential benefits (16.504(c)(1)(iii)) plainly cannot be made without considering the potential benefits. Final-

ly, the CO cannot rationally conclude that a single award is more beneficial to the government than multiple awards (16.504(c)(1)(vi)) without considering the benefits of multiple awards. This is especially true since the CO is obligated to give preference to multiple awards to the "maximum extent practicable." 48 C.F.R. § 16.504(c)(1).

As discussed above, the preference for multiple awards is based on the finding that when multiple ID/IQ contracts are awarded under a single solicitation, the contractors compete head-to-head for task orders, producing significant price and technological benefits which generally do not ensue under a single award. Defendant acknowledges this, stating that "[t]he benefit to be derived from the use of multiple awards is lower prices and better quality that results from competition." Def.'s Reply 18.

The CO did not address these benefits in his analysis. In addition, he stated during his deposition that he was not aware of any attempt by GSA to determine the price or other benefits which might accrue if multiple awards were made. Barber Dep. 59, 79, 81, 83–84. Furthermore, he did not present any reason to believe that the presumed benefits underlying the statutory preference will not ensue if multiple contracts are awarded under the New York RFP. Therefore, it is concluded that the CO's analysis is not consistent with the applicable provisions of FAR 16.504(c)(1).

Defendant responds that multiple awards are simply a means of achieving the benefits of competition among *multiple providers.* According to defendant, the structure of the New York RFP will achieve these same competitive benefits without the costs associated with multiple contracts by providing for competition from other MAA and FTS 2001 contractors after the forbearance period and from non-MAA/FTS 2001 vendors during the life of the contract. Defendant states that "common sense dictates that if the same competitive benefit can be achieved through the use of multiple providers under a single award, as is the case in this solicitation, without the costs of administering multiple contracts, as would be the case with multiple awards, greater savings are achieved using a single award than from multiple awards." Def.'s Reply 18. Therefore, defendant asserts, the CO's conclusion that a single award is in the government's best interests is proper.

However, the government's assumption that the structure of the New York RFP will foster the same type of competition and achieve the same competitive benefits as multiple contract awards is unsupported and unreasonable. In order to provide services in New York in competition with the MAA contractor, vendors not participating in the MAA or FTS 2001 program will have to persuade federal agencies to develop and implement their own acquisition programs, which must comply with the competition requirements of CICA and the FAR, instead of simply issuing task orders to the MAA contractor. This arrangement is not reasonably equivalent to multiple vendors competing head-to-head for each task order issued under the contract. Furthermore, defendant has not cited any evidence in the Acquisition Plan or anywhere else indicating that federal agencies are interested in opting out of the MAA program and running their own telecommunications acquisitions. *See* 48 C.F.R. § 7.105(b)(2) (Acquisition Plan should "[d]escribe how competition will be sought, promoted and sustained throughout the course of the acquisition"). On the contrary, based on GSA's projection that 80% of the local telecommunications needs of federal agencies covered by the MAA program will be fulfilled by MAA contractors, there is no basis for concluding that non-MAA/FTS 2001 vendors will represent a significant competitive force.

Similarly, the record indicates that other MAA/FTS 2001 contractors will not provide significant competition for the New York contractor in the near future. Obviously, in light of the forbearance period, the New York contractor will face *no* competition from these sources during the first year of the contract (25% of the base contract term), when the New York contractor is converting federal users to its system. Barber Dec. ¶ 11. After the forbearance period, other MAA/FTS 2001 contractors interested in competing in New York face the prospect of breaking the ties the incumbent has estab-

lished, an obstacle not faced by multiple contractors competing head-to-head from the beginning of the contract term.

Furthermore, the record does not indicate that there will be many MAA/FTS 2001 contractors available to compete with the New York contractor after the forbearance period. The FTS 2001 program has not yet begun so there is no basis for concluding that it will soon provide a source of potential competitors. With respect to the MAA program, GSA has only issued RFPs in the two other pilot cities, San Francisco and Chicago. Expansion of the program depends on its success in the pilot cities and GSA has not indicated when it will have enough information to determine if expansion is warranted. Hence, at this point, it appears that the New York contractor will have only two potential competitors in the near future—assuming that the San Francisco and Chicago contracts are awarded to different contractors and that both are willing to compete in New York.

Finally, even assuming there will be MAA/FTS 2001 contractors able and willing to compete after the forbearance period, they must obtain contract modifications, which require GSA's approval, before they can provide services in New York. The record indicates that GSA is reluctant to permit more than one contractor to work in the New York MAA. For instance, the CO states in his declaration that GSA "desires to establish a common service and management platform for local services in its regional offices nationwide" and fears that "[a]s the number of vendors providing services increases, the risk to the Government in establishing and maintaining the common service and management platform increases." Barber Dec. ¶ 21(d).

Similarly, GSA has expressed concerns about the general administrative costs resulting from multiple providers and it has no plan in place for administering contract modifications which would allow other MAA/FTS 2001 contractors to provide services in New York. Barber Dep. 66. In short, all of the evidence in the record suggests that GSA is not inclined to grant other MAA/FTS 2001 contractors access to the New York area after the forbearance period, even if such contractors were available and willing to compete.

Hence, in contrast to direct, immediate, and continuous head-to-head competition for task orders presumed to result from multiple awards, the competition the New York contractor will face under the structure of the MAA program is, at best, deferred and uncertain. Therefore, the government's conclusion that the structure of the MAA program will provide the same competitive benefits as multiple contract awards is unreasonable and does not excuse the CO's failure to consider the benefits of multiple awards.[7]

Finally, even if the CO's failure to consider the benefits of multiple awards does not contravene the applicable provisions of FAR 16.504(c)(1), it renders the analysis unreasonable, especially in light of the dubious findings regarding the supposed benefits of a single award. According to the CO, multiple awards are not in the government's best interests because a single award will: 1) ensure that the contractor receives a substantial line commitment and revenue guarantee which is necessary to offset investment risks and attract competitors; 2) reduce usage charges; 3) bring greater economies of scale; and 4) reduce coordination difficulties

7. The government also asserts that the Price Maintenance Mechanism will ensure that GSA receives the same competitive price benefits which would result from multiple awards. However, while this mechanism may periodically ensure that the government is not paying a disproportionately higher price than other buyers for similar telecommunications services, no cogent argument has been presented explaining how a biannual survey of public tariffs will produce the same price benefits as head-to-head competition between multiple contractors. In fact, OFPP found that, when using single-award ID/IQ contracts *with* price reduction clauses such as the Price Maintenance Mechanism, "the government

had to negotiate in a sole-source environment and was often unable to realize the economies and efficiencies afforded by vigorous competition among vendors in the marketplace." *Supra.* n. 3. Likewise, GSA found that the head-to-head competition between the two contractors under the FTS 2000 program produced prices which were significantly *lower* than the lowest available commercial tariffs for comparable services. AR Tabs 12–13. Hence, there is simply no reasonable basis in the record for concluding that the Price Maintenance Mechanism is an adequate substitute for the direct, continuous competition which prompted Congress to establish the preference for multiple awards.

and administration costs associated with multiple awards.

With respect to the first factor, the CO found, based on "industry feedback," that committing all 22,000 federal lines in the New York area to one vendor is necessary to stimulate investment and induce vendors to compete. Barber Dec. ¶ 14. However, the cited feedback, which consists of only one comment from an unnamed vendor suggesting that "the government include *time commitment* as a factor in pricing under the MAA" does not support the CO's finding. AR Tab 18 (emphasis added). In fact, the record indicates that there are millions of lines in the New York area and that committing only 22,000 to one vendor would not stimulate significant investment. Conroy Dec. ¶ 10.

Similarly, with regard to the minimum revenue guarantee needed to ensure adequate competition, the CO states that industry recommended a revenue guarantee ranging from a minimum of 20% of the contract ceiling to 75% of the 4–year billing. Barber Dec. ¶ 15; Barber Dep. 43. The New York MAA contract ceiling is $200 million. AR Tab 41 § H.1. Twenty percent of this figure is $40 million. GSA considered the government's estimated value of the New York contract ($66 million) and the funds available for the minimum revenue guarantee ($7 million) and determined that $7 million (11% of the estimated contract value and 3.5% of the contract ceiling) was a sufficient revenue guarantee to induce offerors to compete. The CO states that reducing this figure by dividing it among multiple contractors would unacceptably increase the winning vendor's risks and diminish competition, contrary to the government's interests. Barber Dec. ¶¶ 15–16; Def.'s Mot. 21.

The government's insistence on a minimum revenue guarantee of $7 million is arbitrary. The record indicates only that industry requested a minimum guarantee of $40 million.

Obviously, GSA did not take this request as meaningful evidence of the amount needed to induce competition since the agency determined that $7 million, less than 18% of the vendors' request, would suffice. Accordingly, there is *no* evidence in the record indicating what minimum revenue guarantee is necessary to attract competitors. Likewise, there is no evidence that even one offeror willing to compete for the New York contract if the revenue guarantee is $7 million will be dissuaded from offering competitive prices if the figure is reduced to $3.5 million, $1.75 million, or even less. As a result, GSA's position that a minimum revenue guarantee of $7 million is necessary to attract competitors is unreasonable and provides no basis for overriding the Congressional preference for multiple awards.

The CO next determined that a single award would be in the government's best interests because it would produce significant savings in usage charges. Barber Dec. ¶ 18. This is based on the government's position that, under the solicitation, calls between government users within the New York MAA handled by a single vendor are "on-net" and not subject to usage charges while the same calls handled by different vendors are "off-net" and subject to usage charges. The CO estimates that if there is one vendor for the entire MAA, and therefore no government-to-government calls which are off-net, the government will save approximately $71,500 per month in usage charges.

However, the concern regarding usage charges appears to be of the government's own making. The CO was not aware of anything which would prevent GSA from simply stating in the solicitation that all government-to-government calls within the MAA, even if handled by different contractors, would be considered "on-line" and therefore not subject to usage charges. Barber Dep. 75–76, 96–97.[8] Furthermore, the

---

8. In fact, GSA has already demonstrated its ability to manipulate the definition of on-net calls to foster competition. On July 20, 1998, GSA amended the New York RFP to provide that calls between government locations in suburban New York and New Jersey would be deemed long-distance calls to be handled and billed by the government's designated long-distance carrier if the awardee is prohibited by law from carrying such calls. This amendment is designed to allow Bell Atlantic to compete; the company is legally prohibited from transporting calls between suburban New York and New Jersey. A responsible incumbent contractor must usually be allowed to

CO acknowledged that the estimate of the savings in usage charges which would result from a single award was not based on anything. Barber Dep. 77. Finally, even if multiple awards would result in some additional usage charges, these costs must be weighed against the potential price benefits of multiple awards in order to determine whether multiple awards would be in the government's best interests. Since no such comparison was done in this case, the CO's concern about usage charges does not provide a reasonable basis for overriding the preference for multiple awards.

The final two factors relied on by the CO are characterized by the government as "common sense" concerns. First, the CO relied on economies of scale which purportedly would result from a single award. There are approximately 22,000 government lines in the New York area. According to defendant, the CO reasoned that "if the Government needed 22,000 lines, it would receive a better rate if those lines were provided by one offeror instead of several." Def.'s Reply 23–24. This conclusion was not based on any study or evidence. Barber Dep. 38–39. Instead, it is supported by "the same common sense which underlies all bulk buying, whether it is telecommunications services, paper products, or military aircraft." Def.'s Reply 19. Second, the CO relied on "the common sense realization that it is more difficult to coordinate the efforts of several providers than it is to coordinate the efforts of one" and reasoned that "multiple awards, by necessity, increase administrative costs." Def.'s Reply 23–24. Again, no analysis was conducted to estimate how much administrative costs would increase if multiple contracts were awarded. Barber Dep. 57.

These "common sense" concerns do not provide a reasonable basis for overriding the Congressional preference for multiple awards. The preference would be rendered meaningless if it could be overcome simply by pointing to such general concerns which apply to every procurement. Implicit in Congress' decision to establish a preference

for multiple awards is the conclusion that the benefits generally outweigh the "common sense" costs. See S.Rep. No. 103–258, at 15–16 (1994), reprinted in 1994 U.S.C.C.A.N. 2561, 2576 (basis of preference for multiple awards is finding that, generally, multiple awards provide benefits not achieved by a single award "without significantly burdening the procurement system"). Furthermore, one cannot reasonably conclude that a single award is in the government's best interests based on the inherent costs of multiple awards unless those costs are weighed against the presumed benefits underlying the preference. Since the CO did not consider those benefits or explain why they would not ensue if multiple contracts were awarded under the New York RFP, the analysis is one-sided and incomplete.

In summary, by failing to consider the benefits of multiple awards, the CO's analysis violates applicable provisions of FAR 16.504(c)(1). The government's contention that the single-award structure of the New York MAA will achieve the same benefits as multiple awards without the costs is unreasonable and does not excuse the CO's violation. Finally, the CO's conclusion that a single award is in the best interests of the government is also unreasonable, irrespective of the non-compliance with FAR 16.504(c)(1).

Defendant asserts that, even if the decision to award a single contract under the New York RFP is improper, WinStar is not entitled to relief because it has not been prejudiced. However, as a result of the single award decision, WinStar has lost the opportunity to compete for multiple contracts and its chances of receiving a contract under the New York RFP have been reduced. These injuries are not insignificant. Cf. ATA Defense Indus., Inc. v. United States, 38 Fed. Cl. 489, 505 (1997) ("The opportunity to compete for a contract and secure any resulting profits ... has itself been recognized to constitute significant harm."). Furthermore, in contrast to GSA's procedural violation of FAR 16.504(c)(1), WinStar's injury may be redressed if the single award decision is set

compete for a follow-on contract(s). United States v. Thorson Co., 806 F.2d 1061 (Fed.Cir. 1986). The RFP amendment states that if the

contractor is not legally barred from carrying such calls, the government will again deem the calls on-net and not subject to usage charges.

aside on substantive grounds. The CO may decide after reconsidering the matter in accordance with FAR 16.504(c)(1) that multiple awards are appropriate. Since GSA's unreasonable decision to award a single contract has created a non-trivial competitive injury which can be redressed by judicial relief, WinStar has satisfied the prejudice requirement.[9]

When a successful procurement protest is brought, this court is authorized to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). Though WinStar requests declaratory and injunctive relief as well as proposal preparation costs, it is determined that WinStar's injury can be alleviated by declaring GSA's decision to award a single contract under the New York RFP and all RFP provisions reflecting that decision invalid. As a fresh decision will be necessary, such relief will permit the CO to reasonably reconsider the matter in accordance with FAR 16.504(c)(1) while avoiding unnecessary judicial intervention into the procurement process.

**5. Validity of the Geographic Boundary of the New York MAA**

Plaintiff also asserts that the geographic scope of the New York MAA is so large as to unduly restrict competition in violation of CICA. Plaintiff contends that the broad boundary of the MAA fills no legitimate government need while unfairly favoring the incumbent, Bell Atlantic, the only company with sufficient facilities to service the entire

area directly. Defendant responds that the boundary was reasonably drawn to include existing and potential federal users in the New York area, and that any competitive disadvantage WinStar is suffering is the result of its own circumstances, not any government action.

■■■ In preparing a solicitation for supplies or services, a contracting agency must specify its needs in a manner designed to achieve full and open competition and may include restrictive provisions only to the extent necessary to satisfy its needs. 41 U.S.C. § 253a(a)(1)(A), (a)2(B) (1994); *Redland Genstar, Inc. v. United States,* 39 Fed. Cl. 220, 231 (1997). However, an agency is not required to neutralize the competitive advantages some potential offerors enjoy simply because of their own particular circumstances rather than any government action. *Madison Servs., Inc.,* B–278962, 98–1 C.P.D. ¶ 113 at 3; *MCA Research Corp.,* B–276865, 97–2 C.P.D. ¶ 33 at 2–3; *see also Versar, Inc.,* B–254464.3, 94–1 C.P.D. ¶ 230 at 12 ("an offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated").

■■■ The record reflects that the boundary of the contract area was reasonably drawn to serve a legitimate purpose, namely, including as many existing and potential federal users concentrated in the New York City area as possible. Furthermore, the size of the area does not preclude anyone from competing. Vendors without sufficient facilities to service the entire area directly are free to provide a portion of the services indirectly through resale from other vendors.

---

9. Defendant asserts that WinStar has not established prejudice because it has not shown that the government breached its implied duty to consider all bids fairly and honestly. However, this duty, the exclusive source of the court's bid protest jurisdiction before passage of the ADRA, does not arise until after offers have been submitted. *See Mike Hooks,* 39 Fed. Cl. at 153. It does not apply to solicitation protests such as this, filed before offers were submitted, based on the explicit jurisdictional grant of 28 U.S.C. § 1491(b)(1) rather than the implied contract theory, and consisting of the protester's objections to solicitation provisions rather than the government's treatment of its offer. Hence, the implied duty cannot be the standard used to

determine if a protester objecting to a solicitation has been prejudiced.

Likewise, the prejudice requirement applicable in post-award protests cannot be applied in solicitation protests. In a post-award protest, the protester must establish that, but for the agency's improper action, there was a reasonable likelihood or a substantial chance that it would have been awarded the contract. *See Candle Corp. v. United States,* 40 Fed. Cl. 658, 665 (1998). This standard envisions a review of the contract award or bid evaluation process to determine what might have occurred if the government had not erred. It cannot be applied prospectively when the evaluation of offers has not even begun.

The fact that Bell Atlantic is the only company with sufficient facilities to service the entire area directly is of no consequence. This is the result of Bell's particular circumstances, not any government action. Therefore, it is concluded that the contract area set forth in the New York RFP does not violate CICA.

## CONCLUSION

For the reasons stated above, it is determined that there are no genuine issues of material fact and that GSA's decision to award a single ID/IQ contract under the New York RFP is arbitrary, capricious, and contrary to law. However, it is also concluded that the geographic scope of the proposed New York MAA contract is not improper and that plaintiff is entitled only to declaratory relief. Therefore, plaintiff's July 10, 1998 cross-motion for summary judgment is **GRANTED** in part and **DENIED** in part. Defendant's June 26, 1998 motion for summary judgment is **DENIED** in its entirety. Accordingly, it is hereby **ORDERED** that:

(1) Final Judgment be entered declaring the Contracting Officer's determination and GSA's decision to award one ID/IQ contract under RFP no. TQD–NY–98–1001 and all RFP provisions reflecting that decision, including §§ H.1 and M.3.1, null and void· as contrary to the requirements of FAR 16.504(c)(1) and lacking a reasonable basis;

(2) Except as granted in (1), all other relief sought in this matter is **DENIED**. Each party must bear its own costs.