CUBIC DEFENSE SYSTEMS,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

and

Metric Systems Corporation,
Intervenor–Defendant.

No. 99–483C.

United States Court of Federal Claims.

Sept. 23, 1999.

Matthew Simchak, Washington, D.C., attorney for plaintiff. Philip J. Davis, Washington, D.C., of counsel.

Domenique G. Kirchner, Washington, D.C., with whom was Acting Assistant Attorney General David M. Ogden, for defendant. Clarence Long and Alan Luthy, United States Air Force, Washington, D.C., of counsel.

Thomas J. Madden, Washington, D.C., attorney for intervenor-defendant.

## OPINION

BUSH, Judge.

The present action brought by plaintiff, Cubic Defense Systems (Cubic), stems from a decision by the United States Air Force (USAF or Air Force) to procure Contractor Logistics Support (CLS) services at Prince Sultan Air Base from a single source, Metric Systems Corporation (Metric), the defendant-intervenor in this matter. Cubic moves for summary judgment based on the administrative record and asserts that the Government's decision to award this contract without competition violates the Competition in Contracting Act (CICA). Additionally, Cubic seeks injunctive relief to prevent the Government from awarding the CLS services contract to Metric. The Government and Metric counter that Cubic's action should be dismissed because Cubic has not demonstrated that the court has proper jurisdiction and has failed to state a claim upon which relief can be granted. In the alternative, the Government and Metric move for summary judgment based on the administrative record and contend that the Government's planned sole-source procurement satisfies the "one responsible source" exception to CICA, and thus is proper and should be allowed to proceed.

## BACKGROUND

The origins of the present action can be traced to the Government's competitive procurement of its United States Air Forces in Europe (USAFE) Rangeless Interim Training System (URITS). URITS is an untethered pilot training system, i.e., it is not confined to a fixed airspace and is not encumbered by extensive ground-based infrastructure. URITS essentially consists of Pods and Debriefing Stations. A Pod is an airborne instrumentation device located under an aircraft's wing, attached to a missile pylon which, based on a Global Positioning System, processes and stores the aircraft's position, velocity, and altitude and the air-

craft's simulated firing of weapons. The Debriefing Station is a computer which replays the results of the flight, showing flight dynamics and weapons events in three-dimensional, computer-generated graphics either to the pilot, following the flight, or to the instructor in real time during the training exercise. URITS's primary benefit to the USAF is that it provides its pilots with the benefit of being able to train at home or deployed locations rather than at a fixed air range.

On May 28, 1998, the USAF issued a draft request for proposals, F08626–98–R–0029 (May 28, 1998 DRFP), indicating that it intended to enter a firm-fixed-price contract to lease up to eighty-eight Pods and eleven Debriefing Stations for three sites in Europe: Aviano Air Base, Lakenheath, and Spangdahlem Air Base, as well as a fourth site to be determined (TBD location). Administrative Record (AR) at 242. The USAF noted that, at each site, the contractor was to provide CLS in support of the URITS. Furthermore, the Air Force announced its plan to retain the option to purchase the Pods and Debriefing Stations during the lease period, if purchasing them appeared to be a more cost effective strategy. AR at 242.

### Evolution of Important Contract Language

The May 28, 1998 DRFP included various Contract Line Item Numbers ("CLINs") to address the different performance requirements and to create options to be exercised for the leasing of Pods and Debriefing Stations in subsequent years and for the fourth TBD location. The May 28, 1998 DRFP included CLINs for the leasing or purchasing of Pods and Stations. *Compare* AR at 248–250 (CLINs 0001–0008 for the leasing of Pods and Stations at Aviano, Lakenheath, and Spangdahlem), *with* AR at 272–273 (CLINs 6001 & 6003 creating the option to buy the Pods and Stations at all locations). CLINs 1020 and 1021 provided an option for the USAF to lease a total of twenty-four Pods and three Debriefing Stations for the

TBD location during the first year. AR at 257–258. CLINs 2020, 3020, 4020, and 5020 covered the lease of this equipment in any subsequent years. AR at 261–272. CLIN 1022 required the contractor to provide CLS services at the TBD location for the first year of performance. AR at 258. CLIN 0016, the precursor to CLIN 6016 (the clause at issue in this protest), required the Contractor to provide CLS re-competition data. AR at 253. That provision did not, however, state when the option for re-competition data could be exercised by the Air Force. Since it appeared that re-competition data could be exercised at any time during contract performance, both Cubic and Metric lodged objections with the Air Force and opined that the Air Force should not be able to exercise the re-competition data option until the Air Force elected to purchase the URITS system. AR at 434, 437, 595. On July 2, 1998, the USAF responded to the prospective offerors' comments, agreeing that the Government's acquisition of CLS technical data for re-competition should only occur in conjunction with the purchase of the system. AR at 16–17, 24d, 24e.

On July 10, 1998, the USAF issued a red-lined version of the May 29, 1998 DRFP, indicating its changes thereto. In this version, CLIN 0016 became CLIN 6016; yet the substantive language concerning the contractor's duty to provide CLS data essentially remained the same. However, in section H001, which gave the USAF the right to exercise the listed options, this red-lined version specified that "CLIN 6016, 6017, 6018 will only be exercised concurrently with CLINs 6001 and 6003 [the options which gave the USAF the option to purchase Pods and Debriefing Stations at all locations] IAW prices established in B2a, B2b, and B2e." AR at 98.

On July 24, 1998, the USAF issued the final Request for Proposals (final RFP). AR at 597. The substantive language in CLIN 6016 remained the same as it had throughout the pre-solicitation period.[1] AR at 631.

---

1. In its final iteration, CLIN 6016 provides, in pertinent part, as follows:

The Contractor shall provide the additional data and update any data necessary for re-

competition of CLS depicting the latest URITS configuration to include sufficient data rights (including sufficient data rights for data delivered IAW Exhibit A) and to include data for

However, the language in H001 regarding the USAF's exercise of the CLINs 6001, 6003, 6016, 6017, and 6018 differed from the red-lined version issued on July 10, 1998. This language in the final RFP now stated:

CLIN 6017, 6018 will be exercised concurrently with CLINs 6001 and 6003 IAW prices established in B.2.a, B.2.b and B.2.e. *CLIN 6016 will be exercised in conjunction with CLINs 1020, 1021 or CLINs 6001 and 6003 IAW prices established in B.2.a, B.2.b, and B.2.e.* CLINs 6001 and 6003 will be exercised IAW prices established in B.2.c, B.2.d, and B.2.f at anytime from award to completion of contract.

AR at 648–649 (emphasis added). This identical language appears in the URITS contract. AR at 873.

As noted in the quote above, Section H001 also references CLINs 6017 and 6018. CLIN 6017 requires the contractor to provide Peculiar Support Equipment (PSE). The URITS contract describes PSE as consisting of personal computer based test set, cabling, and software. AR at 912. CLIN 6018 covers residual spare parts and requires the contractor to provide spare parts to support the operation of URITS. AR at 850. CLIN 6018, unlike CLINs 6016 and 6017, does not have set prices, and is to be negotiated by the Contracting Officer following exercise of this option. Under section H001 of the URITS contract, both CLINs 6017 and 6018 are to be exercised concurrently with the USAF's purchase of the Pods and Debriefing Stations. AR at 873.

The Air Force awarded the URITS contract to Metric on February 19, 1999. AR at 823–24. Cubic has protested that award before this Court, in a related, yet separate bid protest case.

### URITS Contract's Treatment of CLS at the TBD Location

As previously stated, the May 28, 1998 DRFP initially requested the offerors to supply a firm-fixed price amount to provide CLS at the TBD location for the first year and the remaining option years. However, both Metric and Cubic noted that the cost of CLS

largely was a factor of location and therefore objected to the inclusion of priced options for CLS for the TBD location because no site had been determined. AR at 436, 595, 596. In the final RFP, the USAF deleted all of the CLINs for CLS services at the TBD location. Thus, the requirement to provide CLS at the TBD location was not a part of the URITS Contract as awarded.

### USAF Planned Procurement of CLS at the Prince Sultan Air Base

On May 6, 1999, the USAF announced that it had determined the fourth location under the URITS contract, Prince Sultan Air Base (AB) in Saudi Arabia. In a May 6, 1999 Commerce Business Daily Notice (May 6, 1999 CBD Notice), the USAF announced its intention to procure CLS at Prince Sultan AB on a sole-source basis from Metric. AR at 1109–10. This notice required the CLS capability to be in place no later than October 15, 1999. In addition, the notice stated that Metric was the only qualified source, and found Metric to be uniquely qualified because it owned the Pods and the Debriefing Stations and the proprietary data to the hardware and software supporting the Pods and Stations. The notice also referenced Note 22. Note 22 is a footnote, published every Monday in the printed version of the CBD, that the Federal Acquisition Regulation (FAR) requires the agency to include when it is publicizing a noncompetitive procurement. 48 C.F.R. § 5.207(e)(3) (1999). Note 22 provides:

The proposed contract action is for supplies or services for which the Government intends to solicit and negotiate with only one source under the authority of FAR § 6.302. Interested persons may identify their interest and capability to respond to the requirement or submit proposals. This notice of intent is not a request for competitive proposals. However, all proposals received within forty-five days (thirty days if award is issued under an existing basic ordering agreement) after date of publication of this synopsis will be considered by the Government. A determination

---

support equipment identified in CLIN 6017. CLIN 6016 shall include the additional data required for re-competing CLS in accordance

with Section C and Section H–1 and H–12. Pricing for this CLIN is shown in B.2.a. AR at 850.

by the Government not to compete with this proposed contract based upon responses to this notice is solely within the discretion of the Government. Information received will normally be considered solely for the purpose of determining whether to conduct a competitive procurement.

AR at 1112d.

Five days prior to the publication of the first CBD notice, Cubic submitted an unsolicited proposal to the Air Force, informing the USAF of its ability to supply Pods and Debriefing Stations of a rangeless nature. Roberts Decl. ¶ 38, Pl.'s Prop. Stat. Facts at Ex. 1a; Pl.'s Prop. Stat. Facts at Ex. 1b.[2] This proposal, which was entitled "White Paper on Rangeless Air Combat Training," quoted a product support price associated with CLS, and closed with a promise to include "logistics support" to meet the USAF's needs. Pl.'s Prop. Stat. Facts at Ex. 1b. Otherwise, the overwhelming majority of the White Paper focused on the benefits of the Air Combat Maneuvering Instrumentation. The USAF rejected this unsolicited proposal on June 15, 1999, noting that Cubic's proposal failed to meet the requirements of the FAR for the USAF to accept it. Pl.'s Prop. Stat. Facts at Ex. 1b.

Other communications occurred between the parties following the publication of the May 6, 1999 CBD Notice, and the administrative record includes writings that demonstrate that Cubic communicated with the USAF regarding the CLS work at Prince Sultan AB. According to Cubic, Jorge Ramirez, Cubic's Regional Manager, orally communicated with Elmer Bonnell, a USAF representative, regarding Cubic's interest in the CLS work at Prince Sultan AB. Ramirez Aff. ¶¶ 4–5, Pl.'s Prop. Stat. Facts at Ex. 2; Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj. at 1. This communication allegedly occurred within two weeks of the May 6, 1999 CBD Notice's publication, although Mr. Bonnell recollects this conversation as occurring later, in early June, 1999. *Compare* Ramirez

Aff. ¶ 4; Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj. at 1, *with* Bonnell Aff. ¶¶ 5–6, Def.'s Opp'n Pl.'s Mot'n Summ. J.App. at 8. Mr. Bonnell subsequently informed Cubic that the USAF did not intend to obtain the CLS technical data until the USAF purchased the Pods and Debriefing Stations at Prince Sultan AB.[3] From this communication, Cubic surmised that it could not compete for the CLS contract if it did not have the CLS technical data. Ramirez Aff. ¶ 7; Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj. at 2. Furthermore, in a letter dated June 8, 1999, Cubic notified the contracting officer, Jaciel Robbins, and Government counsel that it intended to file a protest with this Court on or about Wednesday, June 9, 1999. AR at 1122–23. Cubic did not file a protest on that date, and according to the records of the contracting officer, Mr. Ramirez left her a phone message stating that Cubic would not protest the USAF's sole-source procurement decision announced in the CBD notice. AR at 1140; Ramirez Aff. ¶ 8, Pl.'s Prop. Stat. Facts at Ex. 2.

On June 17, 1999, the USAF exercised CLINs 1020 and 1021 for the lease of twenty-four Pods and three Debriefing Stations for Prince Sultan AB. The parties memorialized this action in the form of a separate contract, F08635–99–C–0060 (SWA Contract).

More than a month later, on July 26, 1999, Cubic filed its Verified Complaint, and moved for a temporary restraining order and a preliminary injunction to halt the planned CLS sole-source procurement. Cubic asserted that the USAF's intended sole-source award to Metric at Prince Sultan AB would violate CICA and its implementing regulations and would cause Cubic irreparable economic injury. To debunk any Government argument that Metric represented the only responsible source because of its ownership of technical data rights needed to perform the CLS work, Cubic asserted that the URITS contract required the Government to obtain the CLS technical data when it leased or purchased

---

2. The court uses Exhibit 1a as a designation for the first Exhibit 1 that appears in Cubic's Proposed Statement of Facts, and Exhibit 1b to designate the second Exhibit 1 that appears.

3. Mr. Ramirez and Mr. Bonnell disagree as to the date, but not the substance, of this conversation.

the Pods and Debriefing Stations for the Prince Sultan location. According to Cubic, because the USAF had leased the Pods and Debriefing Stations, the Air Force was required to exercise its rights to obtain the CLS data and, accordingly, the USAF could not decline to compete the CLS work based on its refusal to obtain the CLS data.

The USAF issued a new CBD notice on August 9, 1999, amending its earlier notice of May 6, 1999. This notice reiterated that Metric represented the only responsible source because of its access to the CLS data and clarified the CLS requirements.[4] The new notice also generally stated that the USAF planned contract award for September 1999. Finally, while this notice included Note 22, it explained that the time period for compliance with Note 22 commenced with the official publication of the initial May 6, 1999 CBD Notice.

On August 20, 1999, the USAF issued its "Justification for Other than Full and Open Competition" (Justification or J & A). AR at 1124. The content of this Justification generally followed the factors that FAR § 6.303–2 establishes. As authority for the Justification, the USAF recited 10 U.S.C. § 2304(c)(1): "the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency." AR at 1127. The USAF also cited the FAR's implementation of this exception to CICA.[5] Applying this authority, the USAF stated that Metric possesses the technical data to perform the CLS work, and the Government cannot obtain this data until it purchases the Pods and Debriefing Stations. To support this point, the USAF pointed to the URITS Contract, ex-

plaining that the contract permits the Government to exercise the CLS data option at two definite points in time either when it leases the Pods and Debriefing Stations or when it purchases them. Because the USAF elected not to exercise the CLS data option when it leased the Pods and Debriefing Stations, the USAF cannot exercise the CLS data option unless it purchases these items.

The Justification further explained that it would have been futile to acquire the CLS data because the data would not have been available in time to compete the CLS work. Also, significantly, Metric owns the peculiar support equipment (PSE) and spare parts and under the URITS contract, the Government cannot acquire these items until it purchases the Pods and Debriefing Stations. Without these items, a new contractor could not perform the CLS requirements unless the contractor reverse-engineered these items, a time-intensive process that the USAF considered wholly infeasible. Finally, in applying the authority, the USAF pointed out that performance by a contractor other than Metric perform CLS would create potentially significant contract administration problems because Metric's lease payments under the URITS contract are tied to the performance of the Pods and Debriefing Stations, which is directly reliant on the quality of CLS services. In the remainder of the Justification, the USAF explained its efforts to obtain competition, perform market research, achieve a fair and reasonable price without competition, identify interested parties, and otherwise foster competition.

The Government filed the administrative record on August 23, 1999. Subsequently, the parties filed concurrent briefs on August 31, 1999. Cubic moved for summary judgment

---

4. The original CBD notice generally stated an overall CLS requirement for twenty-four Pods and three Debriefing Stations. The new notice stated that Metric was required to provide CLS for eight Pods and one Debriefing Station, while retaining the ability to provide CLS during surge periods, estimated to be once or twice per year, for up to twenty-four Pods and three Debriefing Stations. This amendment maintained the number of Pods or Debriefing Stations that the contractor had to have the capacity to support, while reducing the amount to be serviced routinely.

5. FAR § 6.302–1(a)(2)(iii) (1999) states:

> services may be deemed to be available only from the original source in the case of follow-on contracts for the continued provision of highly specialized services when it is likely that award to any other source would result in (A) substantial duplication of cost to the Government that is not expected to be recovered through competition, or (B) unacceptable delays in fulfilling the agency's requirements.
>
> *Id.*

under RCFC 56 and RCFC 56.1 based on the administrative record: whereas the Government and Metric moved to dismiss Cubic's protest, and in the alternative, moved for summary judgment. On September 7, 1999, the parties filed their respective oppositions to motions for summary judgment. On September 8, 1999, the court heard oral argument from all three parties. This Opinion first will address the Government's and Metric's motions to dismiss and then turn to the parties' cross motions for summary judgment.

## DISCUSSION

### I. Motion to Dismiss

The Government and Metric argue that the court should dismiss Cubic's action because this court lacks subject matter jurisdiction to entertain Cubic's suit and because Cubic fails to state a claim upon which relief can be granted. *See* RCFC 12(b)(1) (providing lack of subject matter jurisdiction as a defense); RCFC 12(b)(4) (providing "failure to state a claim upon which relief can be granted" as a defense). The court must first address the Government's and Metric's contentions regarding the court's jurisdiction and, only after determining that the court has jurisdiction over the controversy, may the court then decide the motion to dismiss under RCFC 12(b)(4). *Do–Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 640 (Fed.Cir.1989).

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction (12(b)(1))

In deciding a motion to dismiss, the court must construe the facts alleged in the complaint in the light most favorable to plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court will accept any undisputed factual allegations as true and correct. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). Where the party moving for dismissal attacks the truthfulness of the pleader's factual assertions, the court will not presume that these facts are true, and the court will determine for itself the merits of the jurisdictional claims. *Id.; Maniere v. United States*, 31 Fed.Cl. 410, 414 (1994);

*Mark Smith Constr. Co v. United States*, 10 Cl.Ct. 540, 541 n. 1 (1986). Ultimately, the plaintiff bears the burden of establishing the court's subject matter jurisdiction by a preponderance of the evidence. *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed.Cir.1993); *Reynolds*, 846 F.2d at 748; *Maniere*, 31 Fed.Cl. at 413.

Cubic asserts that this court has subject matter jurisdiction over its protest under the Tucker Act, 28 U.S.C. § 1491(b)(1) (West Supp.1998). Cubic alleges that it is an "interested party" within the meaning of section 1491(b)(1) and within this court's recent jurisprudence interpreting that provision. In support, Cubic argues that its status as an established contractor in air combat training, participation in the URITS contract competition, submission of an unsolicited general proposal, and expression of interest via telephone communications with a USAF representative all demonstrate its standing as an interested party. Furthermore, Cubic contends that, but for the USAF's wrongful withholding of CLS technical data and consequent violation of CICA, Cubic would be a prospective bidder.

The Government asserts that Cubic admits that it does not possess the capability to perform the CLS work at Prince Sultan AB, and therefore, Cubic does not represent a prospective offeror or an interested party, a prerequisite of the court's subject matter jurisdiction. Metric contends that Cubic's complaint, which relies on this court's bid protest jurisdiction, is actually based on an interpretation of the URITS and SWA contracts, to which Cubic is not a party. According to Metric, whether the USAF should have exercised CLIN 6016 represents a question of contract administration outside the court's bid protest jurisdiction.

The court finds that Cubic has adequately demonstrated the court's subject matter jurisdiction over its challenge to the USAF's planned sole-source procurement. First, Cubic's complaint is not based solely on a question of contract interpretation and contract administration. Rather, Cubic's attack on the USAF's planned procurement is based on the USAF's alleged violation of CICA in

connection with its plan to procure CLS at Prince Sultan AB. Second, under the rationale articulated in *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489 (1997), Cubic represents an interested party for purposes of section 1491(b)(1).

### 1. Cubic Alleges a Violation of CICA

Metric contends that the allegations found in Cubic's complaint, in essence, encompass a challenge to the USAF's administration of the URITS contract, which this court cannot entertain under its bid protest jurisdiction. In *CCL, Inc. v. United States,* 39 Fed.Cl. 780 (1997), this court addressed a similar argument, and ruled that it had jurisdiction to hear the plaintiff's protest. Thus, the court rejects Metric's argument, and rules that Cubic's complaint properly invokes the court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1).

In *CCL,* CCL entered a contract with a Defense Department (DOD) agency to perform information systems maintenance service at a DOD installation in Denver. Prior to the award of this contract, the Government had entered a contract with another contractor, BDM, to provide similar services, albeit at different DOD locations. *Id.* at 786. The Government modified BDM's contract, creating the option for BDM to provide maintenance services at additional DOD sites, one of which was the same Denver site at which CCL was performing. Subsequently, and following CCL's contract award, the DOD agency ordered BDM to perform maintenance services on information systems equipment that CCL had previously maintained. *Id.* at 788. Consequently, DOD did not renew CCL's contract. The Government, in *CCL,* argued that the court lacked subject matter jurisdiction because CCL's action amounted to a dispute involving contract administration. The court rejected that argument, finding that CCL's contention was that DOD had violated CICA by adding work to BDM's contract without competing it. *Id.* Such an argument, the court ruled, clearly invoked the court's jurisdiction under section 1491(b)(1) because that statute confers jurisdiction upon the court to entertain " 'an action by an interested party objecting to ...

any alleged violation of statute or regulation in connection with a procurement....' " *Id.* at 789 (quoting 28 U.S.C. § 1491(b)(1)).

Metric's arguments similarly characterize Cubic's allegations as raising questions of contract administration. However, in reviewing Cubic's complaint, it is plain that Cubic first alleges that the USAF will violate CICA if it contracts with Metric without competition as it intends. *See* Compl. ¶ 2. To support this assertion, Cubic argues that the Government, consistent with the express language of the URITS contract, should have obtained the CLS data that would allow it to compete the planned, sole-source CLS contract. *See id.* ¶¶ 10–13. Accordingly, as in *CCL,* the court rules that Cubic has alleged that the USAF's plan will violate CICA, an assertion that clearly invokes this court's jurisdiction under section 1491(b)(1).

### 2. Cubic is an "Interested Party"

The Government asserts that Cubic does not represent an interested party. Borrowing the GAO jurisdictional statute's definition of interested party, which uses "actual or prospective bidder or offeror," in part, to define interested party, *see* 31 U.S.C. § 3551(2) (Supp.1999), the Government argues that, because Cubic admittedly lacked the technical data necessary to perform the CLS services, it cannot possibly be a prospective offeror. Def.'s Mot'n Dismiss & Mot'n Summ J. at 2–5. Because this court previously has rejected the rationale upon which the Government's assertion rests, the court also declines to accept the Government's present argument.

With Congress' passage of the Administrative Disputes Resolution Act in 1996, this court's bid protest jurisdiction expanded to allow the court:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). Because Congress failed to define "interested party" this court

has looked to the GAO jurisdictional statute's definition for assistance to supply meaning to this term. The GAO's definition of interested party is: "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2).

This court has noted the slight incongruities between the GAO's statute and the court's, and thus has treated GAO's definition as instructive, rather than binding. *See Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 245 (1997) (employing the GAO statute's definition, yet referring to it as "narrower"); *CCL, Inc.,* 39 Fed.Cl. at 789–790 (employing the GAO statute's definition "to inform the discussion," yet articulating its hesitancy to rely on this definition because of the differences in the two statutes); *ATA Defense Indus.,* 38 Fed.Cl. at 495 (using the GAO statute's definition for analytical purposes, yet noting that GAO's definition "arguably is more narrow"); *see also Winstar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 756 (1998) (employing the GAO statute's definition as guidance); *Cincom Systems, Inc. v. United States,* 37 Fed.Cl. 663, 669 (1997) (reciting the GAO statute's definition); *but see CC Distribs., Inc. v. United States,* 38 Fed.Cl. 771, 778 (1997) (concluding that Congress intended the court's definition of interested party to follow the GAO statute's definition).

The Government refers to the GAO statute's definition and asserts that Cubic does not represent a prospective bidder, because it lacks the CLS technical data, and consequently the capability to perform the CLS work. In doing so, the Government essentially repeats the argument that this court condemned in *ATA Defense Indus.* In that case, which addressed a challenge to a sole-source procurement, the Government argued that the plaintiff was not listed on the Federal Supply Schedule and thus could not have represented a prospective bidder, even though it had inquired and requested that the Government utilize competition. *Id.* at 494–95. In repudiating the Government's argument, the court noted that the Government, in asserting that plaintiff was not a prospective bidder, relied on the very acts

that the plaintiff alleged constituted violations of procurement regulations. *Id.* at 495. Accordingly, the court reasoned "if these procedures did violate controlling statutes and regulations, then the procedures cannot properly serve as a rationale for excluding plaintiff from coming within the scope of Section 1491(b)." *Id.*

When synthesized, Cubic's argument is essentially that, but for the Government's improper interpretation of the URITS contract and resulting wrongful failure to obtain the CLS technical data, Cubic would have been able to compete for the CLS contract. Stated in this "but for" manner plainly reveals that Cubic's claim points to the Government's actions as the cause of its inability to compete and as the root cause of the alleged CICA violation. Therefore, to accept the Government's arguments potentially would allow the Government, through its own actions, to exclude a party from a procurement, thereby hindering competition, and then rely upon those actions to contend that the excluded party was not a prospective offeror and thus not an interested party. *See ATA Defense Indus.,* 38 Fed.Cl. at 495. To do so would subvert the aims of CICA, constrict this court's jurisdiction in contrast with Congress' recent expansion of it, and enable the Government to assert standing to immunize its planned sole-source procurements from CICA-based challenges.

■■■ In addition, this court has announced a two-part test to determine whether a party represents an interested party. First, the party must show some connection to the procurement. *CCL, Inc.,* 39 Fed.Cl. at 790. Second, the party must have an economic interest in the procurement. *Id.* Cubic has demonstrated its connection to the procurement it challenges because of its communications with the USAF regarding CLS. To quote *CCL,* the "work that it contends should have been competed was work that it wanted to do." *Id.* Furthermore, Cubic clearly has an economic interest in the CLS procurement because it alleges that, but for the Government's failure to obtain the CLS data and compete the contract, Cubic would have competed for the contract. Excluded

from the competition, Cubic then potentially will lose a contract in a field in which it is a competitor.

The court finds that Cubic represents an interested party for purposes of section 1491(b) and this court's jurisdiction.

## B. Motion to Dismiss for Failure to State a Claim (12(b)(4))

Deciding a motion to dismiss for failure to state a claim upon which relief can be granted is different than deciding a motion to dismiss for lack of jurisdiction " '[f]or it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.' " *Do–Well Mach. Shop,* 870 F.2d at 639 (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). The important distinction between the two is that dismissing an action pursuant to RCFC 12(b)(4) carries res judicata effect, while a motion to dismiss for lack of jurisdiction does not. *Id.* at 640. Accordingly, the court will not dismiss a complaint for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Because of the austerity inherent in a dismissal pursuant to RCFC 12(b)(4), the court broadly construes the allegations found in the complaint. *Ponder v. United States,* 117 F.3d 549, 552–53 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1040, 140 L.Ed.2d 106 (1998); *Integrated Logistics Support Sys. Int'l Inc. v. United States,* 42 Fed.Cl. 30, 33 (1998). The court must assume that plaintiff's well-pled factual allegations will be accepted as true. *Berkovitz v. United States,* 486 U.S. 531, 540, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *New Valley Corp. v. United States,* 119 F.3d 1576, 1580 (Fed.Cir. 1997); *Ponder,* 117 F.3d at 552–53. In addition, the court must draw all reasonable inferences from these allegations in favor of plaintiff. *Id.* at 552; *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 215 (Fed.Cir.1993) (citing *Gould v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991), *cert. denied,* 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994)).

Metric argues that Cubic's response to Note 22 found in the May 6, 1999 CBD Notice was not timely or meaningful, and thus, amounted to a waiver of Cubic's right to protest the USAF's planned sole-source procurement.[6] Metric contends that Cubic's telephonic expression of interest was insufficient, and failed to furnish the agency with the "hard facts and analysis" that Note 22 contemplates. In so arguing, Metric relies on GAO's jurisprudence that requires a party protesting a planned sole-source procurement to demonstrate that it communicated its interest and its capability to the agency within forty-five days of the publication of the CBD notice. Metric also points to this court's jurisprudence embracing the concept that a party waives its right to protest when it fails to clarify an alleged ambiguity in the solicitation prior to the contract award to support its argument that Cubic waived its right to protest.

Cubic counters that its response to the May 6, 1999 CBD Notice was adequate for three reasons. First, Cubic is an established supplier of training systems and the attendant logistics support, and its participation in the URITS contract competition demonstrated this to the USAF. Second, Cubic's tele-

---

**6.** Metric also argues, akin to its argument that Cubic's complaint actually raises issues of contract administration, that Cubic's complaint, and the relief it seeks, if granted, would require the court to compel the USAF to exercise an option in the URITS contract, to which Cubic is not a third party beneficiary. As such, Metric argues, Cubic has no basis to seek such relief, and therefore Cubic's claim should be dismissed pursuant to RCFC 12(b)(4).

Like Metric's earlier argument characterizing Cubic's complaint as raising issues of contract administration, Metric's 12(b)(4) argument is equally ineffectual. This court "may award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2). Cubic, in its complaint, requested injunctive relief to prevent the USAF from violating CICA and a declaratory judgment that the USAF's proposed noncompetitive procurement is arbitrary and capricious. Compl. at 15–16. Construing these assertions in a light most favorable to Cubic, *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683, Cubic's complaint has sufficiently stated a claim upon which relief can be granted.

phonic communications with the USAF during the forty-five day period following the May 6, 1999 CBD Notice expressed Cubic's interest in the CLS contract. Third, Cubic submitted an unsolicited proposal to the USAF several days prior to the publication of the May 6, 1999 CBD Notice that informed the USAF of its CLS capabilities. Cubic further asserts that from a policy and legal standpoint this court's adoption of the GAO's strict enforcement of Note 22's forty-five day submission deadline would be inappropriate. Cubic's arguments will be addressed in turn, but an explication of Note 22 and CBD notices must occur first to place these arguments in their proper light.

When the Government intends to award a contract to a single source on the basis that the identified source is the only responsible source available, it is required, under CICA, to publish notice in the CBD with respect to such contract. *See* 10 U.S.C. § 2304(f)(1)(C) (1998); *see also* FAR § 6.302–1(d)(2) (1999). Under FAR section 5.207(e)(3), this notice must include Note 22. In essence, the reference to Note 22 in the CBD notice of the sole-source procurement notifies interested parties that they should inform the responsible agency of their interest and capability to perform the anticipated contract work within forty-five calendar days of the paper publication of the CBD notice.[7]

■ The court now turns to Cubic's arguments. This court cannot accept Cubic's contention that its history as a supplier of training systems and its participation in the URITS contract satisfied the requirements of Note 22. Note 22 provides that: "[i]nterested persons may identify their interest and capability to respond to the requirement or submit proposals." AR at 1112d. Identifying an interest and capability requires an interested party to act affirmatively. By asserting its place in the industry as a known supplier and its prior participation in a related procurement, Cubic's argument does not reflect the affirmative, responsive action that Note 22 and the CBD notice expected. To accept Cubic's argument that its established place in the industry and its prior participation in this procurement area demonstrated its interest in the CLS procurement would make a mockery of the modest requirements found in Note 22 and CBD notices of sole-source procurements. The statement of interest and capability that Note 22 contemplates affords the agency an opportunity to reconsider its sole-source procurement decision. *Fraser–Volpe Corp.*, B–240499, 90–2 CPD ¶ 397 (Nov. 14, 1990); *Keco Indus., Inc.*, B–238301, 90–1 CPD ¶ 490 (May 21, 1990). Accepting Cubic's argument would not effectuate this purpose because it would allow potential offerors to rest on their procurement history and assume the agency could infer their interest and capability to compete. *See Simula Gov't Prods., Inc.*, B–274730, 96–2 CPD ¶ 219 (Dec. 9, 1996) (rejecting a protester's argument that the agency was aware of its capability because the protester had participated in the competition of the original contract). In short, Note 22 demands more, and so will the court.

■ Cubic's argument concerning its telephonic expression of interest to a USAF representative is much more meaningful, in terms of the requirements found in Note 22 and the CBD notice, than Cubic's first argument. Reviewing the parties' assertions regarding the telephonic communications, it becomes clear that the parties differ on the dates and content of these conversations. The parties agree that Mr. Ramirez, Cubic's representative, had two telephone conversations with Mr. Bonnell, a USAF representative familiar with the procurement but not acting as the contracting officer. Ramirez Aff. ¶¶ 4–5, Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj.; Bonnell Aff. ¶¶ 5–7. Mr. Ramirez alleges that the first conversation occurred approximately within two weeks of the May 6, 1999 CBD Notice; Ramirez Aff.¶ 6; Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj. at 1, whereas Mr. Bonnell claims that it occurred in early June,

---

7. In fact, the paper publication of the CBD notice constitutes constructive notice of the planned sole-source procurement to any interested parties. *See Julie Research Labs., Inc.*, B–219364, 85–2 CPD ¶ 222 (Aug. 23, 1985). This forty-five day period commences on the paper publication date, not the Internet publication date, in part, because only one publication date should apply to all interested offerors. *FN Mfg., Inc. v. United States*, 41 Fed.Cl. 186, 190 (1998).

1999. Bonnell Aff. ¶ 6. Mr. Ramirez claims that he expressed Cubic's interest in the CLS work to Mr. Bonnell during the first phone conversation. Ramirez Aff.¶ 6, Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj. at 1. Mr. Bonnell, in contrast, claims that Mr. Ramirez did not mention CLS during their conversation. Bonnell Aff. ¶ 6.

Regarding the second conversation, the parties agree that Mr. Bonnell informed Mr. Ramirez that the USAF would not exercise CLIN 6016 (the CLS data rights option). *Compare* Bonnell Aff. ¶ 7, *with* Ramirez Aff. ¶ 6; Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj. at 2. However, the parties disagree as to the date of this conversation: Mr. Ramirez claims that Mr. Bonnell telephoned him within several days of the initial conversation which allegedly occurred in the middle of May, while Mr. Bonnell alleges that this second conversation occurred in late June or early July, after the USAF's exercise of the CLINs 1020 and 1021 which occurred on June 17, 1999. *Compare* Ramirez Aff.¶ 6; Pl.'s Supplementation Mot'n T.R.O. & Prelim. Inj. at 2, *with* Bonnell Aff. ¶ 7.

Because Metric has moved to dismiss Cubic's action, the court will accept Cubic's allegations as true, and will draw all reasonable inferences in its favor. *Ponder,* 117 F.3d at 552–53. It is undisputed that Cubic's representative, Mr. Ramirez, telephonically contacted the appropriate procurement office during the forty-five day period that Note 22 mandates. While Mr. Bonnell claims that the parties did not discuss CLS during the first phone conversation, he does state that this phone call was on the heels of Cubic's written communication to the USAF that it intended to protest the USAF's planned sole-source procurement. Aff. Bonnell ¶ 6. The court finds it puzzling that the parties would not discuss CLS under such circumstances and, construing all reasonable inferences in favor of Cubic, we find that Cubic, at minimum, expressed an interest to the USAF in the CLS procurement.[8]

The USAF's own words also lend credence to finding that Cubic at least expressed an interest to the USAF. In its J & A, in the section explaining the USAF's efforts to obtain competition, the USAF described another telephone communication as a "formal inquiry," despite the fact that this inquiry misunderstood the kind of Pods and CLS service the USAF intends to procure. AR at 1130. The Justification documented that the party making this inquiry immediately "withdrew his company's interest" upon being apprised of his error. *Id.* Thus, compared to this phone conversation, it is clear that Cubic's telephone communication with Mr. Bonnell was sufficient to state an interest in the CLS procurement.

While Cubic expressed its interest in the CLS contract, Metric contends that Cubic's telephone communications failed to articulate its capability to perform the CLS work. Although the court recognizes that the GAO requires a party challenging a planned sole-source procurement to have indicated both its interest and capability to the agency, *see Simula Gov't Prods., Inc.,* B–274730, 96–2 CPD ¶ 219 (Dec. 9, 1996); *Norden Sys., Inc.,* B–245684, 92–1 CPD ¶ 32 (Jan. 7, 1992), requiring Cubic to have indicated in detail its capability to the USAF during the forty-five day period would not be constructive because the lynchpin of Cubic's argument is that the Government's failure to obtain the CLS data rendered it incapable of competing. Thus, under the facts in this case, to require Cubic to spell out its capability to perform CLS, when the thrust of its argument is that the Government's actions render it impossible for it to perform the CLS contract would be a chimerical requirement indeed.

Regarding Cubic's third argument, that it submitted an unsolicited proposal prior to the CBD notice's publication, the court finds this argument unavailing in terms of satisfying the requirements in Note 22. Cubic's proposal was general in nature, clearly not tailored to the CLS procurement it challenges now. Cubic's letter, dated April 29, 1999, did provide budgetary quotations for CLS under

---

8. The court understands that Cubic easily could have avoided this conflict in accounts by articulating its interest to the Government in writing. If this point were not being decided on the basis of a motion to dismiss, the court clearly would not be as indulgent of Cubic's election to communicate its interest orally, rather than in writing.

both a lease or purchase scenario, but it did so based on the delivery and set up of hardware in the continental United States. Pl.'s Prop. Stat. Facts at Ex. 1b. In addition, Cubic based its proposal on the understanding that Cubic would be providing the Pods and Debriefing Stations and would be responsible for the spares associated with CLS. *Id.* This, of course, is not the case at Prince Sultan AB. As further evidence that Cubic did not specifically target its proposal at the CLS procurement at issue, Cubic submitted its proposal to the USAF's Air Combat Command, located in Langley, Virginia, instead of Eglin AB, with which Cubic had dealt with during the URITS contract and which was responsible for the CLS procurement. *Id.* While unsolicited proposals undoubtedly can be persuasive in determining whether a party expressed its interest and capability to a procuring agency, Cubic's proposal in this case does not achieve such persuasion.

Nevertheless, as a result of construing all of these allegations in a light most favorable to Cubic, its actions are sufficient to survive a motion to dismiss. While Cubic's arguments concerning its position in the field of air training systems and the submission of an unsolicited proposal are unavailing, its assertions regarding its telephonic expression of interest are sufficient. Moreover, because the thrust of its argument is that the Government's actions render it incapable to compete for the CLS contract, the court finds it inappropriate to accept Metric's argument that Cubic waived its right to this action because it failed to state its capability to the USAF during the forty-five day period following the May 6, 1999 CBD Notice. Based on the facts of this case, the court is unwilling to accept Metric's arguments regarding waiver and thereby endorse or adopt the GAO's jurisprudence requiring the protester to identify its interest and state its capability to the responsible agency within forty-five days of the publication of the CBD notice. The GAO's jurisprudence and the reasons for the court's unwillingness to adopt it are discussed below.

In deciding protests of noncompetitive procurements, the GAO has synthesized the requirements found in Note 22 with its own timeliness requirements set out at 4 C.F.R. § 21.2. Accordingly, in order for the Comptroller General to entertain a protest challenging a sole-source procurement, the GAO requires that the protester must have identified its interest and stated its capability to the responsible agency within forty-five days of the publication of the CBD notice, and then, after receiving a negative response from the agency, file its protest with the GAO within ten days of receiving the negative response. *See Simula Gov't Prods., Inc.,* B–274730, 96–2 CPD ¶ 219 (Dec. 9, 1996); *Allerion Inc.,* B–256986, 94–1 CPD ¶ 281 (Apr. 28, 1994); *DCC Computers, Inc.,* B–244149, 70 Comp. Gen. 534, 91–1 CPD ¶ 514 (May 29, 1991); *Mine Safety Appliances Co.,* B–233052, 89–1 CPD ¶ 127 (Feb. 8, 1989). This procedure affords the agency an opportunity to reconsider its sole-source procurement decision, "while allowing only serious potential offerors to challenge the agency's sole-source decision." *Fraser–Volpe Corp.,* B–240499, 90–2 CPD ¶ 397 (Nov. 14, 1990).

This court has had the opportunity to implement a forty-five day, proposal-submission timeliness requirement, and has declined to do so. *See FN Mfg., Inc.,* 41 Fed.Cl. at 188 (declining to "reach the broader question of whether a timely-submitted proposal is, in every instance, a prerequisite for challenging an award decision" after finding plaintiff's proposal to be timely submitted). The facts in this case advise against adopting a definite forty-five day proposal-submission deadline because the USAF had already exercised the lease options for the Pods and Debriefing Stations under the URITS contract on June 17, 1999, a few days prior to the expiration of the forty-five day period. *See* AR at 990. The leasing of the Pods and Debriefing Stations represented a definite point in time when the USAF contractually could have exercised CLIN 6016 to obtain the CLS data. Thus, the timing of the USAF's actions discourage this court from adopting such a deadline as an absolute prerequisite to challenging an agency's planned sole-source procurement in this court. *See FN Mfg., Inc.,* 41 Fed.Cl. at 188.

In addition, to support its assertion of waiver, Metric generally relies on a distinguishable line of this court's cases, in which this court has endorsed a GAO timeliness rule different from the forty-five day proposal submission deadline. This court generally has endorsed the GAO's jurisprudence which dismisses a bid protest in which the protester failed to seek to clarify ambiguities or inconsistencies in the solicitation prior to the award of the contract. *Allied Tech. Group, Inc. v. United States*, 39 Fed.Cl. 125, 146 (1997) (concurring with GAO rule that to be timely, objections to solicitation terms must be raised prior to the closing date for receipt of proposals or bid opening); *CC Distribs., Inc.*, 38 Fed.Cl. at 782; *Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, 358 (1994), *aff'd*, 39 F.3d 1198, 1994 WL 572795 (Fed.Cir.) (Table); *cf. Grumman Data Systems Corp. v. Dalton*, 88 F.3d 990, 998 (Fed. Cir.1996) (ruling that, under the now-repealed Brooks Act, the Federal Circuit would not entertain a protest based on an ambiguity in the solicitation, unless the protester sought clarification before the end of the procurement process). However, in *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345 (1997), the court declined to follow the GAO timeliness rules and held that a protester did not waive one of its arguments, when it failed to press that argument earlier during its protest before the GAO. *Id.* at 353. The court also determined that the protester's assertion, that the solicitation and resulting contract were void and illegal, was of significant importance to both the contractor and the public interest to merit the court's consideration. *Id.*

Distilling these cases, it appears that this court has followed GAO's timeliness rule when the plaintiff's protest is founded upon alleged defects in the solicitation, but it has eschewed GAO's rule when the plaintiff has asserted a procurement violation. The one

decision expressly refusing to follow the GAO timeliness rules, *Cubic Applications*, would appear to deviate from the other cases, at least in part, because of the gravity of plaintiff's assertion. Distinct from the line of cases upon which Metric relies, Cubic does not allege that the solicitation for CLS work at Prince Sultan AB contained a defect or ambiguity. Therefore, it would appear to be improper to rely on that line of cases to determine that Cubic had waived its right to challenge the USAF's planned, noncompetitive procurement. Cubic has alleged a procurement violation as the basis of its protest, and because of the gravity of Cubic's assertion and the importance of CICA in the realm of government contracting,[9] it would be unsuitable to adopt a strict timeliness deadline to dismiss Cubic's complaint.

The court is not categorically opposed to enforcing a forty-five day proposal submission deadline as a prerequisite to challenging a planned sole-source procurement in this court, however the facts in this case counsel against adopting such a standard rule at this time. Although Cubic's actions and response to the CBD notice do not rise to the level that one ideally would like to see from a party contesting a planned sole-source procurement, these actions are sufficient to allow Cubic to survive a motion to dismiss.

## II. Motions for Judgment on the Administrative Record

### A. Standard of Review

Cross-motions for judgment on the administrative record are treated as motions for summary judgment under RCFC 56(a). *Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997). Each motion must be evaluated on its own merits and will be granted only if there are no genuine issues of material fact and the movant is entitled to

---

**9.** The public interest is inextricably tied to CICA, in that the competition that CICA requires conserves the public fisc by achieving the lowest possible prices for the Government. *See ATA Defense Indus., Inc.*, 38 Fed.Cl. at 500 (finding that the economic premise that "competition brings consumers the widest variety of choices and the lowest possible prices" underlies CICA's preference for competition) (citing ADAM

SMITH, WEALTH OF NATIONS 112 (1776)). Therefore, the public's considerable interest in the enforcement of CICA further warrants the court's consideration of Cubic's complaint. *See Cubic Applications, Inc.*, 37 Fed.Cl. at 353 (explaining the strong public interest in contesting improper procurement activity) (footnote omitted).

judgment as a matter of law. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988). However, "[a] motion for summary judgment upon the administrative record, or for summary judgment, is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997).

Under the standard of review applicable in bid protests, an agency's procurement decision will not be disturbed unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); 28 U.S.C. § 1491(b)(4). While the agency's decision is entitled to a "presumption of regularity", *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), that presumption does not shield the agency's decision from a "thorough, probing, in-depth review." *Id.* Although the court "recognize[s] the relevant agency's technical expertise and experience, and defer[s] to its analysis unless it is without substantial basis in fact," *Federal Power Comm'n v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972), the court must also perform an informed review of even technical decisions in order to meaningfully exercise its jurisdiction. *Prineville* at 910–911.

■■■ In examining an agency's procurement actions, the agency is given wide discretion in the application of procurement regulations. *Bellevue Bus Serv., Inc. v. United States,* 15 Cl.Ct. 131, 133 (1988); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987); *aff'd,* 854 F.2d 464 (Fed.Cir. 1988). Accordingly, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions, *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998), and, as long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

This court reviews challenged agency decisions in accordance with the standards set forth in the Administrative Procedures Act (APA), 5 U.S.C. § 706 (1994). Under section 706 the reviewing court must determine whether the agency's actions were:

> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2).

■■■ As set forth in *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974), the court must consider four factors and determine whether: (1) there was subjective bad faith on the part of the procurement officials; (2) there was a reasonable basis for the procurement decision; (3) the procurement officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id.* at 574, 492 F.2d at 1203–04.

**B. Merits**

The issue presented to this court for resolution is whether the USAF's decision to issue a sole-source contract to Metric for CLS services for the TBD location was arbitrary, capricious or otherwise in violation of law or regulation.[10] The central question presented in this context is whether the Air Force's J & A, which set forth the statutory exemption to CICA relied upon by the Air Force, was reasonable and supported by a rational basis.

Pursuant to CICA, the government is required to specify its needs and solicit proposals in a manner designed to utilize competi-

---

**10.** Cubic does not allege any bad faith on the part of the Air Force and therefore, this decision does not address that factor as an issue before the court.

tive procedures and obtain full and open competition. 10 U.S.C. § 2304(a)(1)(1994). CICA seeks to make government contracting more efficient and rests on a commitment, where practicable, to bring the benefits of competition to government procurement. Application of CICA anticipates that prior to award of a contract, an agency will make a reasoned determination as to which procedures, competitive or otherwise, will best meet agency requirements. "If an agency attempts such a reasoned determination and acts consistent with that determination, then the agency is granted extensive deference." *ATA Defense Indus.*, 38 Fed.Cl. at 498.

Under the provisions of CICA, Congress has allowed for procedures other than competitive. Here, the Air Force based its sole-source Justification on the statutory exemption which states that the head of an agency may use procedures other than competitive procedures when: ". . . the property or services needed by the agency are available from only one source . . . and no other type of property or services will satisfy the needs of the agency . . . ." 10 U.S.C. § 2304(c)(1). The Air Force also cited and relied upon the implementing provisions of FAR § 6.302–1(a)(2)(iii), which states:

> (iii) For DoD, NASA, and the Coast Guard, services may be deemed to be available only from the original source in the case of follow-on contracts for the continued provision of highly specialized services when it is likely that award to any other source would result in (A) substantial duplication of cost to the Government that is not expected to be recovered through

competition, or (B) unacceptable delays in fulfilling the agency's requirements.

The Justification prepared by the Air Force in support of its determination that Metric was the only source available to supply CLS services to the TBD location was lengthy and detailed. It began with a description of the specific CLS services needed and an explanation that CLS must be in place by December 17, 1999, consistent with the current schedule for delivery of the Pods and Debriefing Stations due to arrive in Saudi Arabia. The Justification states that urgent air combat training needs require that CLS be in place by that time and if it is not, the government will begin to incur liability for lease payments on hardware which is useless without CLS.[11] The Justification goes on to discuss in detail the heart of the argument that, i.e., technical data, peculiar support equipment, and spare parts necessary for contract performance are not available to any source other than Metric, either directly or through the government, and that no other source could acquire these items within the required time frame to meet the government's needs.

Cubic rejects the rationale of the Justification, arguing that, under the terms of the URITS contract, the Air Force was and is still able to obtain the data necessary for Cubic to perform the CLS contract through the exercise of CLIN 6016 (the CLS re-competition data option). Cubic contends that the re-competition data option should have been exercised by the Air Force when it exercised the option to lease the hardware for the TBD location or when it exercised the option to purchase the hardware, whichever

---

11. The urgent and critical nature of this CLS procurement has been succinctly articulated in the affidavit of Capt. Scott A. Sullivan, the program manager assigned to the URITS contract at the Saudi Arabia location. Capt. Sullivan states that the Prince Sultan AB is one of the primary bases for the USAF forces which enforce the Southern No–Fly Zone over Iraq. He further states that combat operations in the No–Fly Zone are occurring virtually daily and that the forces there must remain on a continually high state of alert; thus, making it impossible for them to rotate out to other locations for air-to-air combat proficiency training. Installation of the URITS at the Saudi Arabia location will allow the forces there to maintain their proficiency while still

remaining available for immediate combat operation. Capt. Sullivan states that in July 1999, Headquarters Air Combat Command (HACC), the entity that validates training systems requirements throughout the Air Force, informed his office that "the fielding of URITS at Prince Sultan Air Base is 'essential to support of the Air Force's Expeditionary Aerospace Force' (the Air Force's new approach to overseas contingency operations) . . . ." Capt. Sullivan states HACC also stressed that " 'any delay getting this capability into SWA will result in loss of valuable training opportunities and could impact combat readiness.' " Sullivan Aff. ¶¶ 4–6, Def.'s Opp'n Pl.'s Mot'n Summ. J.App. at 2–3 (quoting HACC).

came first; and that the Air Force's failure to do so was a lack of advance planning upon which it should not be able to rely. In any event, Cubic asserts that the Air Force was not constrained to an exercise of CLIN 6016 at only those two times, but rather may exercise CLIN 6016 at any time. Finally, Cubic asserts that the Air Force's concern about time constraints is misplaced, since the Air Force has overestimated the time necessary to accomplish an open competition of the requirement.

Contrary to Cubic's assertions, the court concurs with the Air Force's interpretation of the relevant contract provisions and determines that the plain language of the URITS contract supports the rationale set forth by the J & A. The Air Force's Justification cites to the re-competition data clause in the context of a re-competition of its URITS requirements at a future date, at a time when it exercises the option to purchase the URITS hardware.[12] Cubic centers virtually its entire argument around the meaning of CLIN 6016 and the Air Force's obligation thereunder to secure the technical data necessary for an initial competition of the CLS requirement at the TBD location. Cubic, however, misinterprets CLIN 6016 from the outset, attempting to apply its provisions to elicit data for a new competition of CLS rather than for a re-competition of CLS. The plain language of the provision, itself, states its application to a re-competition action rather than to an initial procurement. CLIN 6016 is captioned "Data For CLS *Recompetition*" and states that the contractor shall provide "... the additional data and update any data necessary for *re-competition* of CLS .... CLIN 6016 shall include the additional data required for *re-competing* CLS ...." AR at 850 (emphases added). The procurement at issue here is an initial competition for CLS at the Saudi Arabia site, not a re-competition of CLS which would take place at the end of the URITS contract or at such time that the Air Force chose to pur-

chase the hardware and re-compete the entire contract, including support services.

The only instructive reference in the URITS contract to "re-competition data" is contained in the URITS CLS Statement of Work (SOW) at paragraph 3.5.5.3, which provides:

> 3.5.5.3 *Transition of successor.* The performance of logistics support provided by this contract is vital to the U.S. Government's overall effort.... Upon expiration of this contract, a successor may continue CLS support. The successor will need phase-in assistance and training if other than the incumbent contractor. Therefore, if the contractor is an unsuccessful offeror in any subsequent U.S. Government solicitation for CLS of the URITS, the contractor shall, during the last 90 days of this contract, or any extension thereto, provide all reasonable support to the U.S. Government and the successful offeror to ensure an orderly transition and minimize any impact on operations. Their support shall include informal orientation for successor contractor employees on CLS of system common and peculiar equipment and capabilities, and access to all technical documentation and publications on a not-to-interfere basis with CLS during the aforementioned 90 day period. The current contractor shall insure all URITS equipment and components are in serviceable condition prior to transition of successor. The contractor shall plan for and provide current CLS recompetition data (reference contract Exhibit B).

AR at 929–30.

Thus, in addition to the plain language of the provision, itself, the SOW clearly sets forth re-competition data in the context of transition and the turn-over of both hardware and CLS from Metric to its successor contractor upon the expiration of the URITS contract. Looking at the URITS contract as a whole demonstrates that CLIN 6016 was

---

12. The Justification states in relevant part:

   XI. *Steps to Foster Competition:*
   The URITS contract includes priced options to acquire CLS recompetition data, peculiar support equipment, and residual spare parts should the Government exercise its option to

purchase the leased equipment. These actions should overcome barriers to compete UAP [Pods] and UDS [Debriefing Stations] CLS at a future date if the Government elects to purchase URITS and funds are available.
   AR at 1132.

not intended to and does not serve as a vehicle by which the Air Force was obligated to provide technical data for an initial competition of CLS at the Saudi Arabia location. *See Allied Tech. Group, Inc.*, 39 Fed.Cl. at 138 (contracts and solicitations are to be read as a whole, so as to give meaning to all provisions); *see also B.D. Click Co., Inc. v. United States*, 222 Ct.Cl. 290, 299, 614 F.2d 748, 753 (1980); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). Cubic acknowledges that without this technical data it could not respond in a meaningful and credible way to the Air Force's CLS requirement. *Roberts Aff.* ¶ 19, Pl.'s Prop. Facts, Ex. 1 at 7. Therefore, the Air Force's contention is fully supported by the record, as is the Air Force's argument that Cubic is unable to meet the CLS requirements for the Saudi Arabia location because it lacked such data.

Even if the court were to accept Cubic's argument that CLIN 6016 applied to the procurement at hand such that technical data *could* have been made available pursuant to an exercise of CLIN 6016, the Air Force was not *required* to exercise the option when it leased the Pods and Debriefing Stations.[13] CLIN 6016 provides that it "shall include the additional data required for re-competing CLS in accordance with Section C and Section H–1 and H–12." AR at 850. Section H001 of the URITS contract sets forth conditions under which various contract options

may be exercised by the Air Force: "The Contracting Officer may exercise the options specified, in whole, in part, or in any combination of parts, at the CLIN level, at any time within the time periods specified below by giving written notice to the Contractor." AR at 872. With respect to the exercise of CLIN 6016, H001 states: "CLIN 6016 will be exercised in conjunction with CLINs 1020, 1021 [URITS lease options] or CLINs 6001 and 6003 [URITS purchase options] . . . ." AR at 873. These contract provisions clearly and simply state that the Air Force may choose to exercise CLIN 6016 *either* at the time it opts to lease the Pods and Debriefing Stations *or* at the time it chooses to purchase the Pods and Debriefing Stations. Cubic's attempt to read into these provisions a requirement that the Air Force was required to exercise CLIN 6016 at the time it chose to lease the Pods and Debriefing Stations unilaterally modifies the express contract terms.[14]

In addition to the unavailability of technical data which Cubic contends should have been made available through CLIN 6016, two other indispensable items are unavailable to Cubic. The SOW, in Section 3.9 Logistics, sets forth the requirement that the CLS contractor provide both spare parts and PSE: "CLS for the URITS shall include all logistic support, to include all common and peculiar support equipment, replacement

---

**13.** As is the case with CLIN 6016, Cubic fails to state any other adequate grounds for requiring the Government to obtain unlimited rights in the technical data in order to have the ability to provide this data to Cubic to meet the requirements of the Saudi Arabia CLS contract. At best, Cubic cites the Defense Federal Acquisition Regulation Supplement (DFARS) section 252.227–7027, 48 C.F.R. § 252.227–7027 (1999), for the proposition that the Government has the right to purchase the required technical data. Section 252.227–7027, Deferred Ordering of Technical Data or Computer Software, does permit the Government to "order any technical data or computer software generated in the performance of this contract. . . ." Nothing in this clause requires the Government to obtain the data and the GAO, albeit critically, has upheld the reasonableness of an agency's decision not to obtain this data under a similar Deferred Ordering clause. *Pioneer Parachute Co.*, B–190798, 78–1 CPD ¶ 431 (June 13, 1978).

**14.** Since the court has determined that there was no contractual requirement for the Air Force to have exercised CLIN 6016 at the time it chose to lease the hardware at the Saudi Arabia location, it is unnecessary to specifically address the question of whether Cubic could have met the December 17, 1999 deadline if the Air Force had exercised CLIN 6016 on June 17, 1999, at the time the Air Force exercised its lease option. *See* Pl.'s Mot'n Summ. J. at 21–23. The court does note, however, that under Cubic's projected timeline (which the J & A disputes in detail, AR at 1128, and which the government and defendant-intervenor vigorously contest as being overly optimistic), it is entirely reasonable to reach the conclusion that the Air Force would not have been entirely assured of timely compliance with its stated deadlines. *See Magnavox Elec. Sys. Co.*, B–258076.2, 94–2 CPD ¶ 266 (ruling that, where Air Force had a reasonable basis for concern about a contractor's ability to deliver in a timely manner, a sole-source award in a follow-on contract was permissible.)

parts and spares, and operations and maintenance data." AR at 934. The J & A discusses in detail the requirement for the CLS contractor to provide PSE, which is necessary to discover and diagnose problems in the Pods and Debriefing Stations and which will be required to be on-site on a daily basis. Likewise, the Justification discusses the requirement for the CLS contractor to supply spare parts for the Pods and Debriefing Stations. No firm outside of Metric has access to or can provide either PSE or the spare parts required. AR at 1128–1129.

Metric states that the only circumstance under which it will agree to provide the spare parts and PSE to the Government is if the Government purchases the entire system. Metric further states that Cubic's assumption that the two companies could mutually negotiate any agreement for the provision of PSE and spare parts is "pure speculation, especially considering that Cubic and Metric are direct competitors." Epstein Aff. ¶ 5, Intervenor's Opp'n Pl.'s Mot'n Summ. J. The UR-ITS contract options which allow the Air Force to obtain PSE (CLIN 6017) and spare parts (CLIN 6018) are available *only* if the Air Force purchases the Pods and Debriefing Stations.[15] *Id.* The Air Force has chosen not to purchase the Pods and Debriefing Stations because it lacks the funds to do so under an existing prohibition against the purchase of such hardware. Tr. of Oral Arg. at 47; AR at 1127–28, 1131. The Government states that, pursuant to the Conference Report to accompany H.R. 4103, the Fiscal Year 1999 DOD Appropriations Act, the Department of Defense is currently under direction not to obligate procurement appropriations for any hardware for rangeless air combat training until certain studies and certifications are conducted with respect to the Joint Tactical Combat Training System (JTCTS), the system which the Air Force anticipates ultimately will be fielded to meet their training requirements. Def.'s Mot'n Summ. J. at 33, n. 20. Since the URITS contract has been established as only an interim training system, the Government has made a conscious decision to lease rather than buy the URITS equipment. Purchase options were included in the URITS contract primarily in case implementation of the JTCTS is delayed or canceled. AR at 1131.

Cubic does not profess an ability to obtain either PSE or spare parts through reverse-engineering techniques and, indeed, the J & A states that while another firm might eventually be able to reverse-engineer the URITS hardware in order to secure the necessary spare parts and PSE, it could not be accomplished in time to meet the Saudi Arabia CLS contract requirements. AR at 1128–29. *See also* Epstein Aff. ¶ 3, Intervenor's Opp'n. Pl.'s Mot'n Summ. J. The court finds it instructive that GAO has, on numerous occasions, found that a sole-source award was proper given the risk and potential delays associated with reverse-engineering. *See AAI ACL Techs., Inc.*, B–258679.4, 95–2 CPD ¶ 243 (Nov. 28, 1995) (finding a sole-source award to be reasonable given the risk and cost associated with a reverse-engineering effort and considering the agency's needs); *Kollsman, Inc.*, B–243113.2, 91–2 CPD ¶ 18 (July 3, 1991)(determining a sole-source award to be proper, despite the possibility of reverse-engineering, because such an award offered less risk regarding timely delivery). Accordingly, separate and apart from the unavailability of the technical data necessary for a new contractor to perform CLS requirements, Cubic's inability to obtain the PSE and spare parts precludes any consideration of the firm as a viable competitor for the procurement in dispute.

■ Finally, the court turns to Cubic's assertion that the Air Force has attempted to solve problems caused by its own lack of planning by the disputed sole-source procurement. It is well settled that a lack of advance planning may not justify a noncompetitive procurement.

In no case may the head of an agency—

(A) enter into a contract for property or services using procedures other than com-

---

**15.** H001 provides: "CLIN 6017, 6018 will be exercised concurrently with CLINs 6001 and 6003 [URITS purchase options] ...." AR at 873.

petitive procedures on the basis of the lack of advance planning.

10 U.S.C. § 2304(f)(5); 41 U.S.C. § 253(f)(5).

█ It is also well settled that advance planning need not be entirely error-free or even actually successful. All that is required is that the planning actions be reasonable. *See Sprint Communications Co.*, B–262003.2, 96–1 CPD ¶ 24 (June 10, 1996); *Imperial Tooling & Mfg.*, B–249897, 92–2 CPD ¶ 436 (Dec. 23, 1992); *Honeycomb Co. of America*, B–225685, 87–1 CPD ¶ 579 (June 8, 1987). Here, the Air Force did, in fact, engage in extensive planning to procure the URITS system and CLS support for all four locations. As stated previously, the Air Force initially included CLS for all four locations, including the TBD location in the original URITS contract. However, both Metric and Cubic objected, stating that it was not feasible to include a priced option for CLS at the TBD location because no site had been determined. The Air Force acquiesced to the requests of Cubic and Metric and removed the CLS requirement for the fourth site. The Air Force issued its solicitation for the URITS procurement on July 24, 1998. At that time the CLS requirement for the TBD location had been removed, and, although free to do so, Cubic raised no question then or at any time prior to award of the URITS contract about competition of CLS requirements for the TBD location. Not until May 5, 1999 was funding for the fourth site certified as available. Def.'s Opp'n Pl.'s Mot'n Summ. J., App. at 11. The next day the original CBD notice was issued proposing to award a sole-source contract for the CLS requirement to Metric and Cubic first raised concerns about the sole-source procurement subsequent to that CBD announcement.

Under the foregoing circumstances, the court concludes that, given the history of the requirement in the context of the URITS contract and its original inclusion in the advance planning of that procurement, the Air Force did engage in reasonable advance planning. Furthermore, in view of the previously described funding constraints which, in effect, precluded a separate procurement of CLS at the fourth site, the court finds that the Air Force engaged in advance planning that was reasonable, given the time constraints and the overall circumstances. Although its planning was by no means error-free, this court finds that under the above-described circumstances, the Air Force's advance planning was sufficient to withstand Cubic's challenge.

### CONCLUSION

█ For the above-stated reasons, the court determines that defendant has adequately explained its justification to award a sole-source contract to Metric. As a result of the court's analysis, the court finds that judgment upon the administrative record is appropriate. Defendant's actions were not arbitrary, capricious, abusive of discretion, or otherwise not in accordance with law as to any aspect of this procurement.

Accordingly, it is hereby **ORDERED** that:
(1) Plaintiff's applications for a temporary restraining order, preliminary injunction and motion for judgment on the administrative record are **DENIED**;
(2) Defendant's and defendant-intervenor's motions to dismiss are **DENIED**;
(3) Defendant's and defendant-intervenor's motions for judgment on the administrative record are **GRANTED**; and the Clerk of the Court is directed to enter judgment for the defendant;
(4) Except as **GRANTED** in (3), all other relief sought in this matter is **DENIED**. No costs.